809 So.2d 324 (2001)
Curtis E. KNIGHTEN
v.
Annie Bell Morrison KNIGHTEN.
No. 2000 CA 1662.
Court of Appeal of Louisiana, First Circuit.
September 28, 2001.
Writ Denied January 4, 2001.
*326 James C. Dixon, Baton Rouge, for Plaintiff/Appellant, Curtis E. Knighten.
Dorsey C. Martin, III, Baton Rouge, for Defendant/Appellee, Annie Bell Morrison LeBlanc.
Before: CARTER, C.J., PARRO, and CLAIBORNE,[1] JJ.
*327 CARTER, C.J.
This is an appeal from a judgment partitioning the community property of plaintiff, Curtis E. Knighten, and defendant, Annie Bell Morrison LeBlanc (Ms. Le-Blanc).[2] Mr. Knighten appeals from several aspects of the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
Mr. Knighten and Ms. LeBlanc were married in June 1956. Ms. LeBlanc began working for the Louisiana Department of Public Safety and Corrections (DPSC) and participating in the Louisiana State Employees' Retirement System (LASERS) in 1967. Mr. Knighten filed a petition for divorce, and a judgment of divorce was granted in February 1986. The community property regime was terminated retroactive to the date the petition for divorce was filed, October 29, 1985.
Mr. Knighten filed a petition for judicial partition of community property and a detailed descriptive list of the community property and debts in September 1986. Ms. LeBlanc answered the petition and filed a traversal of Mr. Knighten's detailed descriptive list, along with her own detailed descriptive list. The parties conducted discovery during the next year. The record reflects that after the 1987 discovery requests, there was no action on the partition petition, other than a motion to substitute counsel, for ten years.
Ms. LeBlanc was eligible to retire in September 1994. Instead, Ms. LeBlanc entered the Deferred Retirement Option Plan (DROP) on September 26, 1994. During her participation in DROP, Ms. LeBlanc continued working for DPSC and earning her regular salary. During this same time, LASERS deposited a monthly retirement benefit into an individual DROP account for Ms. LeBlanc. Upon termination of her state employment, Ms. LeBlanc, or Ms. LeBlanc and Mr. Knighten, would be entitled to receive the sums deposited into her DROP account. She completed her participation in the DROP program on September 25, 1997. However, she chose to continue working for DPSC and once again began contributing to LASERS.
Trial on the partition of community property was held in January 2000, at the conclusion of which, the trial court rendered the judgment from which Mr. Knighten appeals. This judgment classified and valued several assets and obligations and ordered reimbursements and other credits related to contested assets and obligations, and allocated the assets and obligations.
On appeal, Mr. Knighten complains about four particular aspects of the judgment. One of his complaints pertains to the trial court's order that Mr. Knighten reimburse Ms. LeBlanc for one-half of certain expenses she incurred with respect to the family residence. Other aspects of the judgment about which Mr. Knighten complains include the trial court's valuation of the family residence at $114,000, classification of a life insurance annuity policy as community property and valuation of it at $18,000, and classification of retirement benefits in Ms. LeBlanc's DROP account as her separate property. Because of these alleged errors, Mr. Knighten contends that the amount of the equalizing payment Ms. LeBlanc was ordered to pay Mr. Knighten is insufficient.

REIMBURSEMENT CLAIMS FOR REPAIR/MAINTENANCE/REPLACEMENT WORK AT FAMILY RESIDENCE
In this assignment of error, Mr. Knighten complains that the trial court erred in *328 ordering him to reimburse Ms. LeBlanc for one-half of the expenses she incurred to make repairs and improvements to the family residence after the termination of the community property regime. The contested repairs and improvements include floor replacement, tree removal, gutter replacement, furnace repair and/or replacement, garage door replacement and air conditioning unit repairs and/or replacement.
Expenses incurred between the termination of the community and partition of the community are awarded only when the party claiming reimbursement can prove that the work was necessary and that such work enhanced the value of the property. Kline v. Kline, 98-1206, p.5 (La.App. 3rd Cir.2/10/99), 741 So.2d 670, 672. Between the termination of a community property regime and partition, the spouse in possession of former community property has a duty to preserve the property in the manner in which it was always kept. See Norman v. Norman, 99-2750, pp.11-12 (La.App. 4th Cir.7/12/00), 775 So.2d 18, 25. This duty is based on Louisiana Civil Code article 2369.3, which provides in pertinent part:
A spouse has a duty to preserve and to manage prudently former community property under his control ... in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.
The comments to this article explain that unlike ordinary co-owners, this article imposes a higher and affirmative duty of care for the management of former community property since the presumption that a spouse will act in the best interest of the community no longer exists. LSA-C.C. art. 2369.3, comment (1)a. Moreover, comment (f) recognizes that a spouse who incurs expenses in compliance with the obligation imposed by this article is entitled to reimbursement for one-half the costs in accordance with the general principles of the law of co-ownership found in LSA-C.C. art. 806. Kline, 741 So.2d at 673.
Relying on a general co-ownership provision, LSA-C.C. art. 806,[3] Mr. Knighten argues that because Ms. LeBlanc was the co-owner with enjoyment of the thing held in indivision (the family residence), her reimbursement should be reduced in proportion to the value of her enjoyment. Thus, Mr. Knighten asserts that the trial court should have applied Article 806 and denied Ms. LeBlanc's reimbursement claims. Ms. LeBlanc notes that the failure to pay these expenses would have made her vulnerable to a claim for mismanagement under Article 2369.3. She further asserts that the "special provisions" referred to in LSA-C.C. art. 2369.1[4] work in *329 conjunction with each other to protect the occupying spouse from the normal co-ownership rules such as Article 806.
We find that the trial court had sufficient evidentiary support to order reimbursement of Ms. LeBlanc's expenses for the repair/maintenance/replacement work about which Mr. Knighten complains on appeal. Ms. LeBlanc testified in detail about why the different expenses were incurred. According to Ms. LeBlanc, work was performed on the kitchen and utility room floors because the wooden seals beneath the kitchen floor needed to be replaced and the utility room floor was buckling. The trees had to be removed because they had deteriorated. When the gutters quit working properly, Ms. Le-Blanc called the man who had always been called for gutter problems in the past. He determined that replacing the gutters was necessary. The furnace went out and was deemed unfixable by a professional repairman. This required the replacement of the coils and blower in the heating unit. The wooden garage door was not working and posed a threat of injury; therefore, Ms. LeBlanc had it replaced. Finally, the air-conditioning unit broke and was deemed unrepairable by the repairman. Thus, she obtained estimates to replace the unit and accepted the least expensive estimate. Mr. Knighten did not offer any evidence to contradict Ms. LeBlanc's reasons for incurring these expenses.
Based on this testimony, the trial court found that the repair/maintenance/replacement work was necessary to protect and preserve the property. It also found that the value of the property was enhanced through some of the repair/maintenance/replacement work. We note that reimbursements are factual determinations and absent an abuse of discretion the trial court's decision should not be disturbed on appeal. Norman, 775 So.2d at 25, citing Rosell v. ESCO, 549 So.2d 840 (La.1989). Accordingly, we cannot say the trial court erred in ordering the reimbursements for the contested items.[5] This assignment of error is without merit.

*330 VALUATION OF FAMILY RESIDENCE
Mr. Knighten complains that the trial court erred in not taking the average of the two appraisals of the value of the family residence. Mr. Knighten asserts that if the trial court was truly averaging the two appraisals, it should have valued the family residence at $114,850, instead of $114,000. This would have resulted in Mr. Knighten getting $425 more from Ms. Le-Blanc through the equalizing payment from Ms. LeBlanc (1/2 of the $850 difference between the trial court's valuation and the exact average of the two appraisers' valuations).
In valuing and allocating assets and liabilities to partition community property, the trial court shall act within its broad discretion to consider the source and nature of each asset or liability, the financial situation of each spouse, and any other relevant circumstances. LSA-R.S. 9:2801A(4)(c); Thomson v. Thomson, 34,353, p.3 (La.App. 2nd Cir.1/24/01), 778 So.2d 736, 738. Consequently, the trial court is not required to accept at face value a spouse's valuation of assets, debts, or claims against the community. Chance v. Chance, 29,591, p.1 (La.App. 2nd Cir.5/7/97), 694 So.2d 613, 615. Hence, the trial court is afforded a great deal of latitude in arriving at an equitable distribution of the assets between the spouses. Sherrod v. Sherrod, 97-907, pp.2-3 (La. App. 5th Cir.3/25/98), 709 So.2d 352, 354, writ denied, 98-1121 (La.6/5/98), 720 So.2d 687. If the trial court's valuations are reasonably supported by the record and do not constitute an abuse of discretion, its determinations should be affirmed. Norman, 775 So.2d at 23.
The record reveals that Mr. Knighten's appraiser valued the family residence at $137,700. Ms. LeBlanc's appraiser valued the family residence at $92,000. The trial court assigned a $114,000 value to the family residence, stating in its oral reasons that it was averaging the two appraisals. We are not aware of, nor have the parties directed our attention to, any requirement that a trial court average two conflicting appraisals to reach a valuation of a family residence. Instead, the record must reasonably support the trial court's valuation and the valuation must not constitute an abuse of discretion. See Norman, 775 So.2d at 23. We find that the record supports the $114,000 valuation of the family residence. Thus, in light of the great discretion vested in the trial court for valuing assets to be partitioned, we cannot say the trial court erred in its valuation of the family residence at $114,000. This assignment of error lacks merit.

CLASSIFICATION AND VALUATION OF SECURITY BENEFIT LIFE INSURANCE ANNUITY
In this assignment of error, Mr. Knighten complains about the trial court's classification of a life insurance annuity policy, issued by Security Benefit Life Insurance Company, as community property and its valuation of the annuity at $18,000. Mr. Knighten contends that Ms. LeBlanc failed to present any evidence that the policy remained in existence after the initial premium payment, which was made before the community property regime was terminated. Additionally, Mr. Knighten asserts that there was no evidence that he received any benefit from the policy after the termination of the community property regime.
Things in the possession of a spouse during the existence of the community property regime are presumed to be community, but either spouse may prove that they are separate property. LSA-C.C. *331 art. 2340. The party asserting the separate nature of the property has the burden of overcoming the presumption of community property through clear, positive and legally certain proof that the property was separate. Martinez v. Martinez, 556 So.2d 668, 675 (La.App. 4th Cir.), writ denied, 560 So.2d 23 (La.1990). A trial court's findings regarding the nature of property in possession of a spouse as community or separate are factual determinations that will not be disturbed absent manifest error. Harvey v. Amoco Production Company, 96-1714, p.7 (La. App. 1st Cir.6/20/97), 696 So.2d 672, 677.
The annuity policy was originally obtained in 1982, during the existence of the community property regime, by paying $4,182.75 of community funds to secure the annuity policy. Upon maturity of the policy in November 1996, Mr. Knighten was to receive a monthly payment of $100 for fifteen years, with four percent guaranteed interest. This was the only evidence in the record pertaining to the annuity policy. Specifically, Mr. Knighten did not testify about the value of the annuity policy, whether the annuity policy was still in existence at the time of trial, whether more money had been added to the annuity policy or whether Mr. Knighten had received $100 per month upon maturity of the annuity policy.
The trial court concluded that the annuity policy was purchased during the existence of the community property regime. In light of the absence of evidence that the annuity had been cancelled, the trial court concluded that the annuity was community property and valued it at $18,000. We cannot say this finding is clearly wrong. The record demonstrates that Mr. Knighten failed to establish the separate nature of the annuity policy, that the annuity policy had been cancelled or a valuation that contradicted the trial court's $18,000 valuation. Thus, the record supports the trial court's finding that the annuity was community property and was valued at $18,000. This assignment of error is without merit.

CLASSIFICATION OF DROP ACCOUNT
In this assignment of error, Mr. Knighten contends the trial court erred in finding that the contributions made on behalf of Ms. LeBlanc by LASERS into her DROP account are her separate property. He argues that the trial court should have used the Sims formula[6] to apportion the contributions in the DROP account between the community and Ms. LeBlanc's separate property.
DROP is an optional method of retiring from LASERS that allows a state employee who is otherwise eligible for retirement to continue working at his regular state job and earning his regular salary, for a period not to exceed three years. During this time, the amount that the state employee would have received as his monthly retirement benefit if he had actually retired is deposited into an individual account (the DROP account). When the employee enters DROP, his status in LASERS changes from active member to retiree, even though he continues working at his regular job. Once the employee ends his state employment, he can withdraw the money in his DROP account either as a lump sum or a series of payments spread out over time. LSA-R.S. 11:447-451; Bailey v. Bailey, 97-1178, p.4 (La.2/6/98), 708 So.2d 354, 356.
The amount of the benefit deposited into the DROP account is based in part on the years of service the employee had with the *332 state at the time of entry into the DROP program. This amount is equivalent to the eventual base monthly retirement benefit that the employee will receive upon actual retirement. During the employee's participation in DROP, the employee does not earn any additional service credit for purposes of enhancing his monthly base retirement benefit. Also, during the DROP period, the employee does not accrue additional service credits toward the calculation of the possible supplemental benefits earnable upon employment after the DROP period ends. See LSA-R.S. 11:448B; Bailey, 708 So.2d at 356.
Once the employee's participation in the DROP program ends, the employee can either actually retire and begin receiving his base retirement benefit (which benefit would be the same amount that the monthly DROP contribution had been) or he can remain in state service and begin to accrue additional service credit. If the employee chooses to remain in state service, the additional years of service will not alter his base retirement benefit; however, they will be the basis of a supplemental pension, in addition to the base retirement benefit. LSA-R.S. 11:450D; Bailey, 708 So.2d at 356. Thus, in the DROP situation, the employee spouse's election to enter the DROP program operates, as of the date of that election, to fix the base amount of the employee's eventual monthly retirement benefits, and this amount is credited to the DROP account monthly as retirement benefits, although the actual receipt of the funds in that account is deferred until the employee actually retires. LSA-R.S. 11:448B; Bailey, 708 So.2d at 358.
During her marriage to Mr. Knighten, Ms. LeBlanc began working for the state of Louisiana and participating in LASERS. At the time the community property regime was terminated, Ms. Le-Blanc had 18.2 years of state service. She continued to work for DPSC for almost nine years after the termination of the community property regime. Thus, by September 1994, when she entered DROP, Ms. LeBlanc had 27.1 years of state service, 18.2 of which occurred during the existence of the community property regime, and was eligible to retire.
Once eligible for retirement, rather then ceasing her employment and beginning to receive a monthly retirement benefit from LASERS, Ms. LeBlanc opted to enter the DROP program. Thus, the term of employment and the retirement contributions that gave rise to Ms. LeBlanc's right to have funds credited to her DROP account occurred both during the existence of the community property regime and after the termination of the community property regime. It follows then that the right to receive the funds in the DROP account attributable to Ms. LeBlanc's labor and efforts and retirement contributions during the existence of the community property regime constitutes a community asset, even though the DROP account was established after the community property regime terminated. See Bailey, 708 So.2d at 357.
In the DROP context, the Sims formula must be applied as of the date of the employee spouse's entry into the DROP program, because that is the date the base amount of the eventual monthly retirement benefits is fixed, and the employee spouse earns no further credit toward these retirement benefits while in the DROP program. Bailey, 708 So.2d at 358. The parties' stipulated percentage[7] for Sims formula calculations was based on the date *333 that Ms. LeBlanc entered DROP, implicitly recognizing that Mr. Knighten's right to share in Ms. LeBlanc's eventual monthly retirement benefits was fixed as of that date. But, by the trial court finding that the funds in the DROP account were the separate property of Ms. LeBlanc, the trial court treated Mr. Knighten's right to share in the DROP account benefits as if all of the funds in that account were attributable to Ms. LeBlanc's employment after the community property regime terminated and after she entered the DROP program. See Bailey, 708 So.2d at 358. Based on the Louisiana Supreme Court's decision in Bailey, this constituted error.
As previously stated, the amount of the monthly contribution into a state employee's DROP account is based in part on the years of service by the state employee prior to entry into the DROP program. On the date an employee enters the DROP program, if the employee had instead chosen to actually retire, the amount of the retirement benefit he would receive each month would be the same as the amount deposited into the DROP account. See Bailey, 708 So.2d at 358.[8] Thus, there is no reason to treat the contributions into a DROP account any differently than regular monthly base retirement benefits for purposes of apportioning the benefits between the employee spouse's separate property and the community.
In so holding, we respectfully disagree with our brethren on the fifth circuit in Schlosser v. Behan, 98-280 (La.App. 5th Cir.11/25/98), 722 So.2d 1129, writ denied, 98-3165 (La.3/26/99), 739 So.2d 791, who concluded that funds in an employee spouse's DROP account were the separate property of the employee spouse, where the community terminated 17 years before the employee spouse entered the DROP program. The Schlosser court distinguished Bailey because in Bailey, the community still existed when the employee spouse entered the DROP program, but was terminated during the employee spouse's participation in the DROP program. Schlosser, 722 So.2d at 1131. For the reasons set forth above, we find that this time element distinction is irrelevant. See also Sullivan v. Sullivan, XXXX-XXXX (La.App. 3rd Cir.6/13/01), 801 So.2d 1093 (non-employee spouse entitled to a portion of funds in employee spouse's DROP account though the employee spouse did not enter DROP until seven years after the community property regime terminated); Zalfen v. Albright, XXXX-XXXX (La.App. 4th Cir.7/18/01), 791 So.2d 800 (although employee entered DROP after the community terminated, non-employee former spouse is entitled to a partition of the funds in the DROP account based on the Sims formula). To reiterate, the contributions made to an employee spouse's DROP account are based on years of service and retirement contributions made from the commencement of the employee spouse's state employment through the entry into the DROP program. As to DROP benefits, the Sims formula percentage will factor in and account for the length of time that the *334 employee spouse was in service of the state before and/or after the termination of the community property regime, just as it does with regular retirement benefits. Thus, it will determine which portion of the benefits are attributable to service during the existence of the community property regime and are therefore, community property.
Consequently, we reverse that part of the judgment that classified Ms. Le-Blanc's DROP benefits as her separate property. We amend the judgment and render judgment to provide that the entirety of Ms. LeBlanc's DROP account is to be apportioned between the community and Ms. LeBlanc's separate property in accordance with the Sims formula using the stipulated percentage of 67.16 (18.2 divided by 27.1). Mr. Knighten is therefore entitled to receive one-half of 67.16 percent of Ms. LeBlanc's DROP benefits upon Ms. LeBlanc's completion of her actual state employment and receipt of her DROP benefits.

MODIFICATION OF EQUALIZING PAYMENT
Although we find merit to this last assignment of error regarding classification of the DROP account, this finding does not require modification to the equalizing payment. Mr. Knighten is not entitled to receive his Sims formula percentage portion of the DROP benefits until Ms. LeBlanc ends her state retirement and begins receiving the DROP retirement benefits. Having found no merit in the assignments of error that would have required an amendment to the equalizing payment, this assignment of error also lacks merit.

CONCLUSION
For the reasons set forth in this opinion, the judgment of the trial court is affirmed in part, amended in part, reversed in part and rendered. Costs of this appeal are assessed in the following proportions: twenty-five percent to Ms. LeBlanc and seventy-five percent to Mr. Knighten.
AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART AND RENDERED.
NOTES
[1] Hon. Ian W. Claiborne, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] After her divorce from Mr. Knighten, Annie Bell Morrison married Cleveland LeBlanc.
[3] Article 806 provides in pertinent part:

A co-owner who on account of the thing held in indivision has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to reimbursement from the other co-owners in proportion to their shares.
If the co-owner who incurred the expenses had the enjoyment of the thing held in indivision, his reimbursement shall be reduced in proportion to the value of the enjoyment.
[4] Louisiana Civil Code article 2369.1 provides that "[a]fter termination of the community property regime, the provisions governing co-ownership apply to former community property, unless otherwise provided by law or by juridical act." However, this article also provides that "[w]hen the community property regime terminates for a cause other than death or judgment of declaration of death of a spouse [such as a judgment of divorce], the following Articles also apply to former community property until a partition...." Article 2369.3 is one of these "following Articles."
[5] In his appellate brief, Mr. Knighten cited three cases to support his contention that this court should reverse the trial court's granting of Ms. LeBlanc's reimbursement claims. However, we note that in the cases cited, the trial courts denied the reimbursement claims and the appellate courts could not say that the denials were clearly wrong. See Reinhardt v. Reinhardt, 31,174, pp.16-17 (La.App. 2nd Cir.1/20/99), 728 So.2d 503, 513, affirmed in part, reversed in part on other grounds, 99-0723 (La.10/19/99), 748 So.2d 423 (expenses incurred by claiming spouse, including claiming spouse's refund of rent to lessees because claiming spouse decided to move into and enjoy the former family residence denied by trial court because expenditure made for claiming spouse's enjoyment of the former family residence); Stewart v. Stewart, 98-496, pp.6-7 (La.App. 3rd Cir.12/16/98), 728 So.2d 473, 476-77 writ denied, 99-0158 (La.3/19/99), 740 So.2d 114 (maintenance expenses on two community automobiles in the sole possession of one spouse not subject to reimbursement from other spouse); and Jones v. Jones, 605 So.2d 689, 693 (La.App. 2nd Cir.), writ denied, 607 So.2d 571 (La.1992) (expenses for carpet and stove replacement and painting and plumbing bills denied by trial court because of lack of evidence that strong and substantial economic advantage inured to community as result of the expenditures). Additionally, Stewart is further distinguishable because it involved a reimbursement claim for expenses incurred maintaining two family automobiles that were in the claiming spouse's exclusive use and control. In denying reimbursement to the claiming spouse, the trial court found that these were depreciable assets, whose depreciation was directly related to use. Clearly, expenses related to the use of automobiles, depreciable assets, are distinguishable from expenses related to maintenance and preservation of an appreciating asset such as a family residence. Accordingly, we are not persuaded by the cases cited as support for Mr. Knighten's contention that the reimbursement awards should be reversed.
[6] See Sims v. Sims, 358 So.2d 919 (La.1978).
[7] The Sims formula percentage stipulated to by the parties properly apportioned the years of Ms. LeBlanc's employment and the years of the existence of the community, as of the date that Ms. LeBlanc entered the DROP program.
[8] Pursuant to LSA-R.S. 11:448, it is possible that the amount an employee would be entitled to receive as a base monthly benefit if he actually retired rather than entering DROP would be slightly more than the DROP contribution. Under LSA-R.S. 11:448, accrued annual and sick leave may not be used to attain retirement eligibility for purposes of entering DROP; whereas, they could be used to attain actual retirement eligibility. If used to attain actual retirement eligibility, the base monthly benefit would be based on more creditable service than would the DROP benefit. However, because it is not likely that this variance would be significant, it does not affect our analysis of whether the Sims formula should be applied to apportion DROP benefits.