842 So.2d 1160 (2003)
Noble Edward ELLINGTON, Jr., Plaintiff-Second Appellant,
v.
Peggy Marie McDowell ELLINGTON, Defendant-First Appellant.
No. 36,943-CA.
Court of Appeal of Louisiana, Second Circuit.
March 18, 2003.
*1162 Ward, Nelson, L.L.C., by Joseph R. Ward, Jr., Lynn H. Frank, New Orleans, for Defendant/First Appellant.
Samuel T. Singer, Winnsboro, Stephanie B. LaBorde, Baton Rouge, for Plaintiff/Second Appellant.
Before BROWN, STEWART and DREW, JJ.
*1163 BROWN, C.J.
In this community property dispute, both parties have appealed, assigning as error, inter alia, the trial court's valuation of a community corporation. For the reasons set forth below, we affirm.

Factual and Procedural Background
Peggy McDowell Ellington and Noble Ellington, Jr., were married in 1964 and divorced by judgment dated May 11, 1998. During most of their 35-year marriage, they worked together in the family business, Noble Ellington Cotton Company, Inc. ("NECC"). Noble primarily handled negotiating deals with suppliers and customers, while Peggy ran the office, kept the books and did the paperwork associated with the business.[1] The parties' sons, Ryan and Noble III, were hired by their parents, Ryan in 1992 and Noble III in 1995, and continue to work in the family business.
The business of NECC is buying and selling cotton. NECC buys from farmers, cotton gins and other producers and sells to textile mills and shippers. The gross profit of the company comes from the margin made from this activity. NECC made a profit every year from 1979 through 1998. By 1996, the Ellingtons had made more than two million dollars in the cotton business. With profits, the parties purchased office buildings, farms and apartment complexes.
The parties separated in 1996 and were divorced in May 1998. The instant action is an ancillary proceeding, brought by Peggy Ellington Traylor[2] to partition the community property.[3] Shortly before trial, a considerable part of the community was partitioned by agreement, which, by consent of the parties, was incorporated into a partial judgment of partition dated January 2, 2002.
The trial court was left with two primary issues to address: (1) the value of NECC, a community corporation; and (2) whether Noble caused or permitted the diversion of NECC assets, thereby reducing the corporation's earnings and value to the prejudice of Peggy and, if so, the extent of this diversion.[4]
Both parties had expert witnesses who prepared valuation reports and testified regarding their opinions as to the value of NECC. Peggy's expert was Zoe Meeks, a C.P.A. with experience in agricultural business and familiarity with the cotton buying business. Ms. Meeks' method of valuation was the capitalization of earnings method. According to Ms. Meeks, as of March 31, 2000, the fair market value of NECC was $668,000 and the community interest of each of the parties (and therefore the equalizing payment due to Peggy was $334,000). This valuation method *1164 includes a substantial intangible asset value which she referred to as goodwill. Noble's expert was Carlton Clark, a certified valuation expert. Mr. Clark used a net asset method of valuing the business because he felt that an earnings or income approach, which included goodwill, was inappropriate.[5] According to Mr. Clark, as of December 10, 2001, NECC's liabilities exceeded assets by $54,968; therefore, the company had zero value.
The trial court did not accept totally the methodology of either Ms. Meeks or Mr. Clark, but instead calculated a value using some of the conclusions of each expert. Specifically, the trial court found that:
(a) The standard definitions of "fair market value" in normal accounting practice are not adaptable to the partition of a community-owned business in which one of the parties is allocated the entire business.
(b) The net asset approach used by Carlton Clark is inappropriate in this case.
(c) One of the methods employed by Zoe Meeksthe capitalization of earnings methodis appropriate in this case, but not if based upon a single year's earnings.
(d) NECC has an intangible asset value which supports the use of the capitalization of earnings method.
(e) The determination of "normalized net income" for use in the calculation of the value of the business is appropriate if based upon several years earnings, in this case, 10 years, because the records for that period are available.
(f) Ms. Meeks' calculation of adjustments in arriving at normalized net income is appropriate.
(g) Mr. Clark's calculation of liabilities exceeding tangible assets by $55,000 is accepted.
In order to use the greatest number of years available to determine normalized earnings, it is necessary to use the 2001 figures from Mr. Clark's report because they are not included in Ms. Meeks' report. Mr. Clark's Adjusted Income Statement Summary shows a loss of $142,870 for 2001. The court's procedure thereafter (in each case rounding the amount to the nearest $100) is as follows:
(1) Add the normalized Pre-tax Income (Loss) for each of the years from Ms. Meeks' Income Statement Adjustments. [$136,700 + $221,500 + $220,500 + $197,000 + $181,600 + $217,700 + $251,900 + -$347,700 + $234,200]
(2) Add the adjusted loss figure for 2001 from Mr. Clark's report, as shown above, in order to arrive at a ten year total. [+ -$142,900]
(3) Add $18,000 (based upon $750 per month for the years 2000 and 2001) for expenses paid by NECC but attributable to Ellington-Weaver Cotton Company ("EWCC") as shown on Noble Ellington's amended detailed descriptive list. [+ $18,000]
(4) Divide the total by 10 to reach the average annual normalized pre-tax income. [$1,188,500 divided by 10 = $118,850]
(5) Deduct 34% as the estimated provision for income taxes [$118,850-$40,500 = $78,300]
(6) Divide the balance by 22.5% (Ms. Meeks' discount rate in calculating today's value of a benefit stream that *1165 will be realized over an extended period of time in the future). [$78,300 divided by 22.5% = $348,000][6]
(7) Deduct the $55,000 negative net worth calculation by Mr. Clark based on tangible assets. [$348,000-$55,000 = $293,000]
The result is a company value of $293,000 if the company is allocated to Noble Ellington, and, in that event, the value to Noble Ellington of Peggy Traylor's one-half interest is therefore $146,500.
The second issue before the trial court was Peggy's claim that Noble intentionally diverted community assets out of NECC, causing lost earnings and a diminution in the value of the corporation. The court accepted Noble's explanations for the losses incurred by NECC and rejected Peggy's claim for reimbursement/damages. Both parties have appealed.

Discussion

Valuation of NECC
Former spouses continue to be co-owners of the former community property even after the termination of the community and until it has been finally partitioned. La.C.C. arts. 2369, 2369.1; Robinson v. Robinson, 99-3097 (La.01/17/01), 778 So.2d 1105. In allocating the community assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court must consider the nature and source of the asset or liability, the economic condition of each spouse and any other circumstance the court deems relevant. La.R.S. 9:2801 A(4)(c); Robinson, supra.
The court is required to divide the community assets and liabilities so that each spouse receives property of an equal net value. La.R.S. 9:2801 A(4)(b); Robinson, supra. In order to avoid an unequal net distribution of assets and liabilities, the court may order the payment of an equalizing sum of money. La.R.S. 9:2801 A(4)(d); Robinson, supra.
La.R.S. 9:2801 A(4)(a) provides that the court shall value the assets at the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties. Id. When the parties, however, do not submit evidence of the current value of community assets, the trial court does not err in making its valuations based upon the evidence presented by the parties. See Barrow v. Barrow, 27,714 (La.App.2d Cir.02/28/96), 669 So.2d 622, writs denied, 96-1057, 96-1072 (La.06/21/96), 675 So.2d 1080; Roberts v. Roberts, 542 So.2d 517 (La.App. 5th Cir. 1989), writ denied, 547 So.2d 1317 (La. 1989). As the Fifth Circuit observed in Roberts, supra the trial court is not required to value assets as of the date of trial when the parties do not submit current appraisals or valuations. See also Bridges v. Bridges, 96-1191 (La.App. 3d Cir.03/12/97), 692 So.2d 1186; Monje v. Monje, 94-622 (La.App. 5th Cir.12/28/94), 648 So.2d 1086.
The trial court has broad discretion in partitioning community property. As noted by the Third Circuit in Razzaghe-Ashrafi v. Razzaghe-Ashrafi, 558 So.2d 1368, 1371 (La.App. 3d Cir.1990):
The purpose of [La.R.S. 9:2801(4)(a) ] is to provide an occasion for the court to get a handle on the situation. It does not mean that the court is frozen by any statutory time level or particular valuation at any particular time or for any particular purpose, but simply to place values on the assets for the purpose of accounting, allocation and adjudication *1166 in accordance with the further provisions of La.R.S. 9:2801(4)(b, c, d and e).
In light of the discretion granted to the trial court by La.R.S. 9:2801, the court is not required to accept at face value a party's valuation of assets, debts or claims against the community. Gay v. Gay, 31,974 (La.App.2d Cir.06/16/99), 741 So.2d 149; Kaplan v. Kaplan, 522 So.2d 1344 (La.App. 2d Cir.1988); Alford v. Alford, 94-1464 (La.App. 3d Cir.04/05/95), 653 So.2d 133. If the trial court's valuations are reasonably supported by the record and do not constitute an abuse of discretion, its determinations should be affirmed. Alford, supra. As noted by the court in Starr v. Starr, 557 So.2d 1026 (La.App. 4th Cir.1990), the law provides no mathematical formula for determining the value of community assets.
If the community asset to be valued is an interest in a partnership or corporation, the court must be careful to value the interest, not just the assets of the business entity. Moody v. Moody, 622 So.2d 1381 (La.App. 1st Cir.1993), writ denied, 629 So.2d 1168 (La.1993); Borrello v. Borrello, 614 So.2d 91 (La.App. 4th Cir. 1992); Mexic v. Mexic, 577 So.2d 1046 (La.App. 4th Cir.1991). The trial court's determination of the value of a community business is a factual one which will not be disturbed absent manifest error. Monje, supra; Moody, supra. Furthermore, the trial court's choice of one expert's method of valuation over that of another will not be overturned unless it is manifestly erroneous. Preis v. Preis, 94-442 (La.App. 3d Cir.11/02/94), 649 So.2d 593, writs denied, 94-2939, 94-2942 (La.01/27/95), 649 So.2d 392; Guillaume v. Guillaume, 603 So.2d 235 (La.App. 4th Cir.1992); Stewart v. Stewart, 585 So.2d 1250 (La.App. 4th Cir. 1991), writs denied, 590 So.2d 594, 597 (La.1992).
Both parties urge on appeal that the trial court erred in not accepting their respective expert's opinion regarding the value of NECC. Peggy contends that the trial court, once it decided to use Ms. Meeks' valuation method, was precluded from then using any of Mr. Clark's calculations or conclusions. As noted above, this would result in a value of $668,000 for the corporation and an equalizing payment to Peggy of $334,000. On the other hand, Noble asserts that the trial court should have rejected Ms. Meeks' opinion in its entirety because it was not based upon current data and contained considerable errors, relying instead upon Mr. Clark's opinion that the community corporation was worthless and therefore no equalizing payment was due. Noble also argues that the trial court erred in first allocating NECC to him, then determining its value in his hands. He also takes issue with the trial court's failure to allow him offsetting credits against the value of NECC.
The above statutory and jurisprudential authorities clearly provide that the trial court has great discretion in valuing community assets and liabilities. Furthermore, in making its valuation determinations, the trial court is not bound to accept one expert's opinion to the exclusion of the opinion of other experts and witnesses. This court, in Head v. Head, 30,585 (La. App.2d Cir.05/22/98), 714 So.2d 231, 234, observed that:
To value corporate stock [at issue in the instant case], the court is required to assess and weigh the testimony of the two expert witnesses. Business valuations methods are not an exact science and are basically guides to determine a fair market value for buyers and sellers of a given business. Here, the evaluation is made for the purpose of resolving community property disputes. Given the dynamics of businesses and business *1167 practices, factoring in circumstances that may be unique to the parties, an inflexible formula for determining value is said to be impractical. Achee v. National Tea Company, 95-2556 (La.App. 1st Cir.12/20/96), 686 So.2d 121, 125.
* * *
Generally, the trier of fact is not bound by expert testimony, but is to hear and weigh expert testimony in the same manner as any other evidence. Reasonable and well-founded opinion should be considered. Watts v. Watts, 552 So.2d 738, 740 (La.App. 1st Cir.1989). The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and especially on the facts on which the expert's opinion is based. Goodwin v. Goodwin, 618 So.2d 579 (La.App. 2d Cir. 1993).
The fact-trier is entitled to assess the credibility and accept the opinion of an expert just as with other witnesses, unless the stated reasons of the expert are patently unsound. The effect and weight to be given the expert's testimony depends upon the validity of the underlying facts relied upon by the expert, and rests within the broad discretion of the trial judge. Chance v. Chance, 29,591 (La.App.2d Cir.05/07/97), 694 So.2d 613, 617.
As noted by the court in Head, supra, the trial court should not simply accept one expert's opinion to the exclusion of all other expert evidence. Instead, in this complicated partition/valuation suit, we cannot say that the trial court erred in considering the opinions of both experts to assess and determine the value of the community corporation.
In his written reasons for judgment, the trial court gave detailed support for each of his factual findings regarding the value he assigned to the community corporation. We will examine each one of these determinations in light of the record in its entirety to address the various valuation issues raised by the parties. In this process, given that each of the trial court's conclusions is based upon expert opinion, we will address each party's assignment of error regarding the calculations, conclusions and methodology of the other spouse's valuation expert.

Determination of "Fair Market Value" and Allocation of NECC to Noble Ellington
Noble complains that the trial court erred in first allocating the community corporation to him, then valuing the business. The following is excerpted from the trial court's written reasons:
Both [parties'] expert witnesses acknowledged that their duty was to determine, or estimate, the fair market value of NECC. Meeks' report on page one defines fair market value as "the value, expressed in cash or its equivalent, at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." Clark cites the definition from Treasury Regulations Par. 25.2512-1 which is essentially the same.
It is immediately evident that a community partition is not the "willing buyer and willing seller" situation contemplated by the above definition in the situation where one spouse is to acquire the other spouse's interest. In testimony, Meeks acknowledged that "when you do valuations you have to consider the purpose for which the valuation is to be used and normally in a divorce situation when you're settling property its very rare to have a willing seller." She also *1168 testified that as to the valuation done in this case "this is for property settlement purposes, you don't have to have a willing buyer or a willing seller." When you consider that explanation, it renders the recited definition of fair market value useless. Perhaps more accurate than "the purpose for which the valuation is used" would be the estimation of the different values when the business is acquired by different persons. On cross examination, Meeks readily admitted that her opinion as to value was based upon present management remaining the same ...
In response to questions by the court, she specifically admitted that her estimated value would be different if the company was acquired by anyone other than Noble Ellington. There was no predetermination that the business would be allocated to Noble Ellington and there was no basis for her to proceed on that assumption. Nevertheless, that is what she did. Although her valuation is limited to that one situation and would be of no value for any other allocation of the business, it will nevertheless be used to a limited extent because of the court's decision that the company should be so allocated to Noble Ellington.
Following the lead in his expert's testimony that NECC was worthless, Noble Ellington's "solution" is for the court to allocate the business to Peggy Traylor "at zero" meaning she would acquire all of the assets, assume all liabilities and pay no equalizing payment. Such a solution would be unjust. In the first place, Peggy Traylor is clearly not capable of operating the business. Without demeaning the work she performed during her many years in the company, the testimony makes it very clear that her duties were essentially clerical. She neither bought nor sold cotton, nor did she make business decisions. Secondly, considering the family bitterness preceding the trial and which presumably still prevails, it is virtually certain that if she acquired the business, none of the present management would remain. It is almost too obvious to merit mention that Noble, Ryan, Noble III and Denise Ellington could, without any legal impediments, immediately open a new business with a very similar name and retain all of the customer base which has been developed through the years. Even if Peggy Traylor were capable of operating the business as claimed in Noble Ellington's memorandum, or even if she could hire an experienced cotton buyer, she would almost certainly have no customers. Even Noble Ellington's expert witness recognized that 92% of the customer base was attributable to Noble and Ryan Ellington and none was attributed to Peggy Traylor. Counsel for Ellington claim[s] that it would be unfair to allocate the company to Noble Ellington at a value disproportionate to the value of the same company if allocated to Peggy Traylor. That would be a valid statement if the property at issue was a house, or a car, or a piece of farmland. However, it loses its validity in partitioning NECC. The court is not aware of either statutory or jurisprudential law prohibiting courts from recognizing that a community business can have different values depending upon which spouse acquires it.
The business which has made both Noble Ellington and Peggy Traylor wealthy while at the same time enjoying a comfortable life style is, in this court's opinion, capable of generating handsome incomes for the four members of the family who are presently operating the business. For the court to find that the company has no value in the hands of *1169 Noble Ellington based upon financial records showing a negative net worth based on tangible assets only, would be error and a clear abuse of the court's discretion in partitioning the community.
We agree. As noted by the supreme court in Robinson, supra, in allocating community assets and liabilities pursuant to La.R.S. 9:2801, the trial court has the discretion to divide an asset such as a community owned corporation equally or unequally or to allocate it in its entirety to one of the spouses. In doing so, the court has to consider the nature and source of the asset, the economic condition of each spouse and any other circumstance the court thinks is relevant. (Emphasis added). In the instant case, the trial court determined that the value it placed on NECC was dependent upon which spouse would receive the business. The record, particularly the testimony of the parties and their sons, as well as their respective expert witnesses, supports this conclusion. This assignment of error is without merit.

Use of Capitalization of Earnings Method Based upon an Average of Ten Years' Corporate Earnings
The trial court rejected the valuation method of Noble's expert, Carlton Clark, because it did not include a value for goodwill and instead used the capitalization of earnings method espoused by Peggy's expert, Zoe Meeks, into which an amount for goodwill was factored. In support of its choice of methodology, the court noted the following:
Noble Ellington is the heart of the business. That is one of the difficulties in attempting to use the ordinary meaning of goodwill in a community partition. Perhaps the answer is that NECC has an intangible value which should be recognized but simply does not fit the usual definition of goodwill. Clark, who testified on behalf of Noble Ellington, said that there was no goodwill but later said that the goodwill is personal and non-transferable without the efforts of Noble Ellington. Whether the designation is goodwill or simply intangible asset or some other term should not be important. What is important is what it does to the value of the business, irrespective of its designation.... In this court's opinion, there is something which makes NECC a successful business. For lack of a better term, it appears to the court that the item being dealt with is the customer base which the company has built through the years beginning in 1979. There is no magic in the term "customer base" other than it may be free of the restrictive definitions of goodwill. In his testimony, Clark, while denying the existence of goodwill, used the term customer base, estimating that 55% of the customer base of the company is attributable to Noble Ellington and 37% is attributable to Ryan Ellington.
The court has reviewed the Louisiana case law relating to goodwill, particularly with reference to community businesses which were partitioned by the courts. It is essential to distinguish the cases which decided that goodwill could not even be considered because of the nature of the business from the cases in which the courts have determined that, although goodwill may be an issue, the evidence did not establish a separate value based on goodwill. As this court understands the case law, the only businesses which have thus far been excluded from the consideration of goodwill because of the nature of the services provided are medical, legal and engineering practices. Based upon the testimony of Clark and the argument in memorandum, apparently Noble Ellington contends that his cotton buying business should also be excluded from having *1170 a goodwill value on the same basis as physicians, attorneys and engineers.
Godwin v. Godwin [533 So.2d 1009 (La.App. 1st Cir.1988), writ denied, 537 So.2d 1165 (La.1989) ], had facts similar to the present case. The community owned a carpet, drapery and wallpaper installation business. The husband did most of the work himself but sometimes used contract labor. The wife sometimes assisted in the business by answering the telephone and maintaining the books. The business had very limited tangible assets but the wife claimed the business was worth $300,000 based on goodwill. As in this case, the husband claimed that the business had no value. He asserted that goodwill should not be used in determining value because of the nature of the service he rendered, citing cases in which the husbands had medical practices. The court [in Godwin ] distinguished the facts from the "one man `professional' corporations" and referred to the business... as a "commercial business." The trial court accepted an expert's valuation of $64,000 based upon the business' goodwill and that valuation was affirmed on appeal. By way of comparison, there is no doubt that the husband was a "professional" carpet installer and wallpaper hanger but his relationship with his customers was clearly different from the relationship of a physician to a patient or an attorney to a client.
... [T]his court finds that NECC can and does have an intangible asset value and whether that intangible value is termed goodwill, customer base or something else is not important. What is important, and also much more difficult, is using that intangible value in determining the total value of the business.
Having reviewed extensively the jurisprudence regarding goodwill and the propriety of its inclusion in the value of a community corporation such as NECC, we agree with the trial court that valuation of the Ellingtons' business should include consideration of an intangible value predominantly attributable to NECC's customer base.
Therefore, we will continue our analysis into the trial court's choice of valuation methodology. Clearly, having determined that goodwill would be a factor, the trial court could not accept the net asset valuation method espoused by Mr. Clark, which did not include a value for goodwill. The trial court concluded as follows:
The court finds that the income or earnings approach is the most reasonable in the present factual setting but not in the manner applied by Meeks. Although she had compiled the financial information of the company over a period of nine years, she chose to simply choose one year (2000) upon which to determine "Normalized Net Income." That figure is $153,752 after provision for income taxes. That was the amount used as the "Benefit Stream" in the formula leading to a value of $682,342. She next did what she termed an "Excess Earnings Calculation" which resulted in a value of $653,509. By averaging the Normalized Net Income amount and the Excess Earnings Calculation, she arrived at a rounded value of $668,000.
By comparison, Clark did an earnings calculation based upon the last six years of the company's operation and arrived at an annual adjusted pre-tax earnings figure of $18,427. However, he decided against an earnings approach and concluded that a net asset value method was necessary, presumably because the earnings figure would include goodwill which he felt should be excluded. Accordingly, *1171 he did not calculate a value of the business based upon his earnings calculations. Although he chose not to use the income approach, Clark testified that if an income approach is used, a single year, which was used by Meeks, is not an accurate basis to determine the company's value and that a number of years can better reflect the expected "benefits stream." The court accepts Clark's opinion on that issue and finds that Meeks' choice of using earnings only in the most recent year to determine a "benefits stream" is not the most accurate method available.
Having reviewed the testimony and reports of the two experts, we agree with the trial court's conclusion to use the income approach, but with an average from a number of years as opposed to a single year's income. As noted by Noble, Ms. Meeks' valuation did not include up-to-date figures which were available to her; the trial court's reluctance to base a corporate value upon a single year's income, that year not even reflecting the most recent activity, is understandable. Therefore, we will not disturb steps one through six of the trial court's calculation.[7]
Regarding adjustments, the trial court determined that Ms. Meeks' adjustments to income were more appropriate than those of Mr. Clark. Again, this is reasonable and is supported by the record, given that the trial court chose an income methodology over a net asset approach.[8] We likewise find no error in the fact that the trial court factored into its valuation Mr. Clark's determination that NECC had a negative net worth of $55,000.

Diversion/Mismanagement of Community Assets
The trial court rejected Peggy's claim that Noble intentionally diverted funds out of NECC, causing a loss of earnings and a diminution in the value of the community business. On appeal, she asserts that this conclusion is contrary to the evidence and asks this court to reverse that portion of the trial court's judgment and either award her damages or add a commensurate amount to the value of NECC.
Article 2369.3 of the Louisiana Civil Code provides in pertinent part:
A spouse has a duty to preserve and to manage prudently former community property under his control, including a former community enterprise, in a manner consistent with the mode of use of that property immediately prior to termination *1172 of the community regime. He is answerable for any damage caused by his fault, default or neglect.
As noted in the 1995 comments, this article imposes a higher standard of care in managing and maintaining former community property than the standard imposed during the marriage. The reason for the higher standard of care is that, after termination of the community property regime, the presumption that a spouse will act in the best interest of the community no longer exists. Knighten v. Knighten, 00-1662 (La.App. 1st Cir.09/28/91), 809 So.2d 324, writ denied, 01-2846 (La.01/04/02), 805 So.2d 207; Comment (a), Article 2369.3.
The spouse alleging improper management bears the burden of proving that her former spouse failed to manage and prudently preserve the former community property prior to partition. Anding v. Anding, 32,084 (La.App.2d Cir.08/18/99), 740 So.2d 253; Drobnak v. Drobnak, 97-0021 (La.App. 1st Cir.02/20/98), 708 So.2d 1162. Comment (c) to La.C.C. art. 2369.3 provides that a spouse who asserts a claim under this article is required to prove that the other spouse failed to act prudently in a manner consistent with the mode of use of the property under his control immediately prior to termination of the regime, not simply that he had former community property under his control. The spouse who has control over former community property is in a position similar to that of a usufructuary and thus owes a high standard of care, that of a prudent administrator, in managing and preserving former community assets. Comment (e), La. C.C. art. 2369.3. As noted by the Third Circuit in Gibson v. Gibson, 96-1472 (La. App. 3d Cir.04/02/97), 692 So.2d 708, 710, bad faith is not required under article 2369.3 because the spouse is "answerable for any damage caused by his fault, default or neglect."
The trial court, in its written reasons for judgment, analyzed La.C.C. art. 2369.3 and noted that, while the provision imposes a higher standard of care on the spouse with community property under his control, it does not clarify the burden of proof for the spouse claiming mismanagement. Therefore, the court analogized the instant case to one involving a challenge to corporate transactions [see Dunbar v. Williams, 554 So.2d 56 (La.App. 4th Cir.1988) ], and, based upon Peggy's challenge to the integrity of the transactions between NECC and EWCC, placed the burden of proof upon Noble to establish that the transactions between the two companies were at arm's length and in good faith. The court found that Noble proved that the corporate dealings were at arm's length and therefore rejected Peggy's claim. The court also found that Noble met his burden of proof regarding his organization of Ellington Cotton Company and the "cashing in" of a certificate of deposit.
The trial court's determination that there was no merit to Peggy's claim of diversion/mismanagement of assets is subject to the manifest error/clearly wrong standard. See Anding, supra. We will therefore examine the record to determine whether there is a reasonable factual basis for the trial court's finding.
Peggy claimed that two corporate entities were formed for the purpose of diverting community assets from NECC. As did the trial court, we will examine the evidence regarding the formation and operation of each business. The first one, Ellington Cotton Company, was organized in 1998 by the parties' sons. It is uncontradicted that this business was formed by Ryan and Noble III because they did not want to be "in the *1173 middle" of their parents' dispute about NECC and because they wanted to go into business for themselves. The trial court found that there was nothing sneaky or underhanded about the sons' organization of this business, nor was there any intent to cause problems or financial damage to their mother. Having read the testimony of Ryan and Noble III, we agree. When Peggy's attorney found out about the new company, he advised Noble and his attorney that because of Ryan's position with NECC, he had a conflict of interest and the new company's organization was a potential breach of his fiduciary duties. At that point, Ryan and Noble III agreed to discontinue their business and every transaction which had been conducted was backed out and rebooked through NECC. Again, there was no damage to NECC. The record also supports this finding of the trial court, as well as the court's determination that Noble and his sons were not "caught" trying to hurt Peggy Traylor.
The second entity allegedly formed to divert assets from NECC was Ellington-Weaver Cotton Company, LLC ("EWCC"). EWCC was formed by Noble Ellington, his sons and Robert Weaver. All related parties testified regarding their reason for forming EWCC, which was to enable the Ellingtons to get into the business of shipping cotton to textile mills. All three Ellingtons testified that NECC, whose business was buying cotton, would benefit from their venture with Mr. Weaver, who had the contacts and expertise in shipping that they lacked. Furthermore, it was their testimony that the shipping business was more risky than the buying business and they did not want to subject NECC to these greater risks.
Although Ryan was the most interested in the Ellingtons getting into the shipping business, Noble III, Noble and Mr. Weaver realized a mutual advantage in going into business together. It was neither practical nor feasible to make Mr. Weaver a part owner of NECC or the Ellingtons part owners of his company, so formation of a new business with shared ownership was the logical solution. EWCC was formed in October 1999, with Mr. Weaver owning one-half and Noble, Ryan and Noble III each owning one-sixth of the business.
Specifically, Peggy claimed that NECC sustained losses from sales of cotton at below cost to EWCC. As the trial court observed, the evidence establishes both that NECC sold cotton to EWCC over a two-year period and that NECC realized major losses in one of these years. The following is from the trial court's written reasons:
With a background of a bitter dispute about partitioning the business and a further background of the business having been profitable in almost every prior year, the transactions between the two companies understandably caused grave suspicion and were very probably the leading factor leading to this litigation. For obvious reasons, a major loss under those circumstances was a "red flag" to Peggy Traylor and her attorneys.
Meeks testified that in her opinion, one of the reasons for the loss was the sale of cotton to EWCC at lower than market prices. The documentary evidence, together with Meeks' admissions on cross-examination and the testimony of the witnesses on behalf of Noble Ellington who actually conducted the transactions, establish that Meeks was in error. She did not understand many of the factors involved (such as deductions for payments to the Cotton Board, the "first in, first out" rule and others) and she had not examined all of the documents necessary to evaluate the transactions. To take one purchase from one farmer and attempt to follow it through *1174 the process to its sale does not accurately reflect the transactions of which that particular cotton is a part. Hundreds or even thousands of bales are "booked" in advance of sales and when large amounts are included in a sale, there may be individual lots of cotton which are being sold for less than the price for which purchased, but the entire transaction may result in a profit. It is vital to recognize that the market price of cotton is quoted daily on the Memphis cotton exchange and historical records of those prices are available. In the sales to EWCC, the evidence not only refutes the claim that cotton was sold below market but it shows that in fact, NECC made profits on those transactions.
The trial court went on to examine the record for an explanation for the company's large loss the same year it conducted business with EWCC and relied primarily upon Noble's testimony:
Noble Ellington testified that losses occur in the normal course of business. Sometimes it is necessary to pay more for cotton than what it will be sold for in order to meet a previously "booked" price to a buyer. Minor losses are usually made up by profit on other transactions but sometimes they are not. Losses can also occur for other reasons. [Noble] testified as to how one particular loss occurred during the period in question and it had nothing to do with EWCC. He admitted mistakes were made and that a large purchase "fell through the cracks."
The trial court found that the company records supported Noble's explanation, and also that the market continued to slide downward and that they failed to get the cotton hedged, at a loss of $160,000 to NECC. The court pointed out, however, that this loss did not affect only Peggy, but affected equally Noble's interest. The court accepted Noble's explanation of the company losses and observed that the records and invoices relating to the sales to EWCC, as well as the testimony of other witnesses, particularly Mr. Weaver, all support that the conclusion that the transactions between the two companies were at arm's length and in good faith. Placing emphasis on its discretion to hear and observe the witnesses, the trial court further found that there was no "kickback" arrangement between Mr. Weaver and Noble Ellington. The record supports the trial court's determinations in this regard.
However, our inquiry is not over until we review the trial court's determination regarding the "cashing in" of a $500,000 certificate of deposit. The following is taken from the trial court's written reasons for judgment:
In January of 1999, the company owed a substantial debt to Franklin State Bank. In addition to the company's cotton inventory, the debt was secured by a $500,000 certificate of deposit registered in the name of NECC and issued by the same bank. The interest rate on the loan was 2% greater than the interest rate of the CD. Primarily on the recommendation of Noble Ellington III, it was decided that the debt should be paid down by redeeming the CD and applying those funds together with $350,000 cash on hand at the company. Using the CD funds reduced the annual interest being paid by the company by $10,000.
When Peggy Traylor learned that the company no longer owned the CD, she apparently concluded that something improper had occurred. When asked "what possible reason" could she think of for the company paying the $850,000 to the bank, her answer was "to keep me from getting half of it." Such a response reveals how little she understood about the company's business. On cross-examination, even Meeks admitted *1175 that applying the funds to the debt for the purpose of reducing interest indebtedness was a good business decision. As a director and the owner of half of the company's stock, Peggy Traylor should have been consulted, or at least informed, of the transaction. However, the evidence indicates that she had not been consulted on management decisions prior to that time, even when she was an employee. There is likewise no evidence indicating that she asked to be consulted or wished to be consulted. Nevertheless, recognizing her position as a director and shareholder, particularly after her employment terminated, would have been a desirable change, irrespective of her failure to request it. Keeping her informed would have, at the very least, explained the "disappearance" of the CD.
Using company money to reduce company debt is too simple an issue to warrant further discussion. There is no evidence even remotely indicating that such a move was intended to, nor did it in fact, prejudice NECC or Peggy Traylor in any way.
Having reviewed the record, we likewise find no error in the trial court's determination that Noble's use of the $500,000 CD to reduce outstanding company debt did not rise to the level of mismanagement or diversion. We conclude that the trial court correctly found that Peggy's article 2369.3 claim was not meritorious.

Conclusion
For the reasons set forth above, the trial court's judgment is AFFIRMED.
Costs of this appeal are to be divided equally between the parties.
AFFIRMED.
NOTES
[1] Peggy worked at NECC until the parties separated in August 1996.
[2] After her divorce from Noble, Peggy married Louisiana Supreme Court Justice Chet Traylor. Prior to his election to the supreme court, Justice Traylor served as a district judge in the 5th J.D.C. In light of this fact, all of the judges of the 5th J.D.C. recused themselves from the partition suit and an ad hoc judge was appointed by the supreme court.
[3] Other parties were added as defendants and other causes of action were asserted by supplemental pleadings filed by Peggy. These additional parties and causes, however, have been dismissed and are no longer part of this litigation.
[4] The parties also asked the trial court to include in the partition a grand piano. The court, however, found that this piano was not community property, but was either the separate property of Peggy or belonged to the parties' son, Noble III, who was not a party to the partition proceeding. Therefore, ownership of the piano was not determined by the court.
[5] According to Mr. Clark, the company's goodwill is personal and therefore should not be considered.
[6] The parties have not questioned the 22.5% used by Ms. Meeks.
[7] Neither party assigned as error step five, deduction of 34% for estimated income taxes or step six, division of the balance by 22.5% (Ms. Meeks' discount rate for benefit stream.)
[8] In his appeal, Noble asserted that the trial court erred in failing to allow him offsetting credits against the value of NECC. He urges this court that the company value should be offset with: a $10,000 "loan" to Peggy; $139,443.19, which is the salary Peggy received from NECC after she ceased working there; and $238,630, which represents loans to the parties. Addressing first the shareholder loans, the trial court found that these were not loans, but withdrawals or shareholder dividends used for community purposes which were simply carried on the books of the company as loans for tax purposes. The court noted that the alleged borrowers never signed notes evidencing the debts, nor was there any type of debt repayment schedule. Regarding the amounts received by Peggy after she stopped working for NECC, the trial court noted that there was no objection to Peggy's withdrawal of $10,000 and that her salary and expenses were voluntarily paid by the management of the company. Notwithstanding her withdrawal from the day-to-day affairs of the community business, Peggy remained a director and the owner of one-half of the corporate stock. We agree with the trial court that reimbursement or offsetting credits are not appropriate. This assignment of error is without merit.