CHAISSON, J. |-i This is an appeal from a trial court judgment partitioning the community of acquets and gains that formerly existed between Kelli Soileau Vedros and David John Vedros. For the reasons that follow, we reverse in part, affirm in part and amend in part. PROCEDURAL HISTORY Kelli Soileau Vedros and David John Vedros were married on March 4, 2002. Two children were born of this marriage, a daughter in 2002, and a son in 2004. On February 26,2010, Mr. Vedros filed a petition for divorce, and on April 8, 2012, the parties were granted a divorce. Each party filed a petition to partition the community property in accordance with the provisions of La. R.S. 9:2801. Ms. Vedros filed hers on August 1, 2011, and Mr. Vedros filed' his on May 30, 2014. The parties also filed sworn descriptive lists and traversals to the descriptive lists. The trial on the partition of the community property was conducted over the course of five days in February, March, and April of 2016. At the conclusion of the proceedings, the trial court took the matter under advisement. On July 22, 2016, the trial court issued a written judgment, which valued and granted! ownership of certain assets to each party, denied various reimbursement claims, and ordered Mr. Vedros to make an equalizing payment to Ms. Vedros in the amount of $151,750,09.-From various aspects, of the partition judgment, Mr. Vedros now appeals, ■ DISCUSSION La. R.S. 9:2801 provides the procedure for the judicial partition of community property and. settlement of claims'after dissolution of the marriage. The pertinent section of La. R.S. 9:2801(A) provides for the allocation of assets and liabilities as follows: | ¡>.(4) The court shall then partition the community in accordance with the following rules: (a) The court shall value the assets as of the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties. (b) The court shall divide the community assets and liabilities so that each spouse receives property of an equal net value. ■ (c) The court shall allocate or assign to the respective spouses all of the community assets and liabilities. In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety, to one of the spouses. The court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the* court deems relevant. As between, the spouses, the allocation of a liability to . a spouse obligates that spouse to extinguish that liability. The allocation in no way affects the rights of creditors. (d) -In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct. The court may order the execution of notes, mortgages, or ether documents as it deems necessary, or may impose a mortgage or lien on either community or separate property,, movable or immovable, as security. It is well settled that a trial court has broad discretion in adjudicating issues raised by divorce and partition of the community regime. The trial judge is afforded a great deal of latitude in arriving at an equitable distribution of the assets between the spouses. The trial court’s allocation or assigning of assets and liabilities in the partition of community property is reviewed under the :.abuse of discretion standard. Goines v. Goines, 09-994 (La. App. 5 Cir. 3/9/11), 62 So.3d 193, 198, writ denied, 11-721 (La. 5/20/11), 63 So.3d 984. The Louisiana Supreme Court, in Snider v. La. Med. Mut. Ins. Co., 14-1964 (La. 5/5/15), 169 So.3d 319, 323, rehearing denied, 14-1964 (La. 6/30/15), 2016 La. LEXIS 1501, set forth the well-established guidelines for reviewing factual determinations of the trial court as follows: It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the | .¡testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. This test dictates that a reviewing court must do more , than simply review the record for some evidence that may controvert the trial court ruling. Rather, it requires a review of the entire record to determiné whether manifest error has occurred. Thus, the issue before the court of appeal is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Where the fact-finder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. (Internal citations omitted.)" The trial court’s findings based on determinations regarding the credibility of witnesses are undoubtedly entitled to great deference. However, where documents or objective evidence so contradict the witness’s story, or the.story itself is. so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find, manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989). In light of these precepts, we will now address the challenged aspects of the community property partition. Denial of Reimbursement Claims In his first three, assignments of error, Mr. Vedros complains that the trial court erred in denying his claims for reimbursement for .community funds .that were used to make mortgage payments on three separate properties of Ms. Vedros. The separate nature of these, properties and the liabilities thereon are undisputed. La. C.C. art. 2364 governs the reimbursement claims at issue and provides as follows: If community property has been used during the existence of the community property regime or former community property has been used thereafter to satisfy a separate obligation of a spouse, the Lother spouse is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used. Whether a reimbursement claim is allowed is a finding of fact which is reviewable under the manifest error standard. Katner v. Katner, 09-974 (La. App. 4 Cir. 12/23/09), 28 So.3d 566, 573. Lot 14, Fort Leon, Belle Chasse This vacant lot was purchased by Ms. Vedros prior to her marriage to Mr. Vedros and is clearly her separate property. However, Mr. Vedros maintains that community funds were used to pay the mortgage on this property, and thus, he is entitled to reimbursement for one-half of the community funds used to make payments on this separate lot. At trial, Ms. Vedros testified that she bought the lot before they were married, that the lot was subject to a mortgage, and that some of the payments on the lot were made with community funds. She initially approximated that -less than half of the payments' on the lot were made with community funds. During her examination, Ms. Vedros was presented with numerous can-celled checks. She acknowledged that the checks were written during her marriage to Mr. Vedros from their joint checking account and that these checks were for payments oh her separate lot. During her testimony, she verified that community funds were used to make the following payments on the Fort Leon property: 2002—-one payment of $483.00; 2003—ten payments of $476.00; 2004—twelve payments of $476.00; 2005—eight payments of $476.00 and one payment of $500.00; 2006—nine payments of $476.00 and one payment of $500.00; 2007—seven payments of $476.00, one payment of $1,500.00, and one payment of $927.71. Mr. Vedros also testified at trial regarding the payments on this property. He likewise identified the checks that were written from the community account to make payments on the Fort Leon lot. It is noted that the cancelled checks were | ¿proffered by counsel for Mr. Vedros but not allowed into evidence because of a discovery violation.[1] Despite the uncontradicted testimony presented on this issue, the trial court denied Mr. Vedros’s claim for reimbursement “for failure of exacting proof,” noting in its reasons for judgment that “no documentary evidence was introduced regarding any community funds used to pay on the mortgage encumbering this property.” In challenging this denial of reimbursement on appeal, Mr. Vedros contends that the district court committed manifest error in disregarding Ms. Vedros’s admission under oath as to the payments by the community of $25,806.71[2] towards her separate obligation. He points out that the law permits other types of evidence to be considered other than just documentary evidence. We agree. Even though the cancelled checks were not allowed into evidence, Ms. Vedros testified as to the specific amounts paid by the community on her separate lot. Given Ms. Vedros’s admission that community funds were used to make payments on her lot and the uncontradicted testimony on this issue, we find that the trial court was manifestly erroneous in denying this particular claim for reimbursement by Mr. Vedros. In her appellate brief, Ms. Vedros asserts that even assuming there was evidence of payments from the community, Mr. Vedros’s claim should still be denied because he offered no proof to distinguish the amounts paid on principal and interest. This argument is based on her belief that Mr. Vedros is only entitled to reimbursement for one-half of the principal payments made from community funds. lfiWhenever mortgage payments are paid in connection with the marital home which constitutes the separate property of one spouse, the community is entitled to reimbursement for principal only. Payments for interest, taxes, and insurance are generally not considered as reimbursable expenses to the community because the community has had the benefit of using the house as the marital residence. Dillenkoffer v. Dillenkoffer, 492 So.2d 71, 75 (La. App. 5th Cir. 1986), writ denied, 494 So.2d 338 (La. 1986); Bourgeois v. Bourgeois, 09-986 (La. App. 5 Cir. 3/23/10), 40 So.3d 150, 154. While this statement of law relied upon by Ms. Ved-ros is accurate, it is not applicable to the instant situation because the separate property at issue herein was not used as a marital home and did not benefit the community in any way. In Munson v. Munson, 00-348 (La. App. 3 Cir. 10/4/00), 772 So.2d 141, the Third Circuit found that the trial.court did not commit legal error by including mortgage interest in its award to the ex-wife for her half of the community funds used to pay the mortgage on her ex-husband’s separate property. In reaching this, conclusion, the Third Circuit looked to the actual wording of La. C.C. art. 2364, which provides for reimbursement for one-half of. the amount or value that the property had at the time it,was used, and stressed, “Article 2364 clearly and unambiguously provides for the actual value of the used community property to serve as a restitution measure.” The Third Circuit acknowledged that under the jurisprudence, the exclusion of interest would be warranted in situations where the community receives benefits from the separate property upon which the mortgage attaches. The appellate court then noted that no such community benefit existed in its case, and therefore, the inclusion of interest in the trial court’s award was warranted. In so ruling, the court remarked: “... Mr. Munson’s separate property at issue did not benefit the community .... His property neither generated any rent, |7to which the community property would be entitled, -nor was it used as the Munson’s family home.” Id. at 146. Likewise, the separate property at issue did not benefit the community and was not used as a marital residence, and. therefore, Mr. Vedros is entitled to one-half of the mortgage payments made from the community funds for this separate property. In light of this fact, Ms. Vedros’s argument, that Mr. Vedros’s claim for reimbursement should be denied because he did not distinguish the amounts paid for principal and interest, is without merit. Based on the foregoing, we find that the trial court was manifestly erroneous in denying this claim for reimbursement and conclude that Mr. Vedros is entitled to reimbursement of $12,903.36, which is one-half of the community funds that were used to pay the mortgage notes on Ms. Vedros’s Fort Leon property. Accordingly, we reverse that portion of the trial court judgment that denied Mr. Vedros’s reimbursement claim for his one-half share of community funds used to pay these mortgage notes. 608 and 612 Gardere Avenue, Harvey, Louisiana Ms. Vedros bought these two properties during her marriage to Mr. Vedros; however, there is no dispute as to the separate nature of these two properties. Mr. Vedros contends that despite the separate nature of the properties,. community funds were used to pay a portion of the mortgage notes on these properties, and therefore, he is entitled to reimbursement for one-half of the community funds that were used. He argues that there is a presumption that the funds used to pay these mortgages were community funds, and that because Ms. Vedros failed to overcome this presumption, the trial court erred by improperly, shifting the burden back to him to prove that the. community paid the obligation.[3] He further argues that the | «trial court erred by using an improper standard of “exacting proof,” rather than the proper “preponderance of the evidence” standard. We find that Mr. Vedros’s argument that there is a presumption that community funds were used to pay Ms. Vedros’s separate obligations is misplaced. La. C.C. art. 2361 provides that, “Except as provided in Article 2363, all obligations incurred by- a spouse during the existence of a community property regime are presumed to be community obligations.” La, C.C. art. 2363 provides that, “A separate obligation of a spouse is one incurred by that spouse prior- to the establishment of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse.” In this case, Mr. Vedros does not dispute that the properties located at'608 and 612 Gardere are the separate properties of Ms. Vedros, or that the mortgages encumbering those properties are her separate obligations. Therefore, the presumption contained in Article 2361 is irrelevant to the question that was before the trial court regarding this reimbursement claim. To the extent that Mr. Vedros attempts to rely upon this presumption, that reliance is' misplaced. The other presumption that Mr. Vedros relies upon is contained in La. C.C. art. 2340, which provides that, “Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they aré separate property.” The ^relevant question for the trial court regarding this presumption did not involve resolution of the character of the properties themselves, or the obligations encumbering them, as community or separate. Rather, the question before the trial court was whether or not the funds used to pay these obligations were themselves' community funds. In his appellate brief, Mr. Vedros, in his discussion of the Article 2340 presumption, states that, “[t]he law presumes that, despite the separate nature of the property, that the community paid the obligation during the existence of the community .regime.” We find that this is a misinterpretation of the presumption contained in Article 2340. Furthermore, we are aware of no other provision of law that provides that based upon the mere fact that a separate obligation of a spouse is paid during the community regime, a presumption is created that the community paid that obligation. Nor are we aware of any provision of law that provides, that the funds used to pay a separate .obligation of a spouse during the community, regime are presumed to be “things in the possession of a spouse” during the community regime. That the funds were in the hands of a spouse, and thus presumed to be community funds, before being used to pay the separate obligation, is a fact that must be proven. As discussed infra, it is not a fact that is presumed. The burden of proof is on the party making a reimbursement claim. Keenan v. Keenan, 15-828 (La. App. 3 Cir. 2/3/16), 186 So.3d 289, 298, writ denied, 16-0418 (La. 4/15/16), 191 So,3d 590. In order to carry his burden of proof, Mr. Vedros seeks to rely upon the presumption contained in La. C.O. art. 2340. “A ‘presumption' is an inference created by the legislature that the trier of fact must draw if it finds the existence of the predicate fact unless the trier of fact is persuaded by evidence of the nonexistence of the fact to be inferred.” (emphasis added). La. Code Evid. Art. 302(3); Talbot v. Talbot, 03-814 (La. 12/12/03), 864 So.2d 590, 598. In other words, in order for a presumption to apply, the evidence 11npresented must first establish the predicate fact. A plain reading of Article 2340 indicates that- the predicate fact that the evidence must establish in order for the presumption of community to apply, is that the “things,” the characterization of which is in dispute, must have been in “the possession of a spouse during the existence of a regime of community of acquets and gains.” In arguing that there is a presumption that the community paid these separate obligations, Mr. Vedros, in effect, argues that the predicate fact itself. (ie., that the funds used to pay her separate mortgages were in the possession of Ms. Vedros during the. community), is established .by a non-existent presumption. This is simply án incorrect statement of the law as it relates' to' the presumption contained in Article 2340. To the contrary, the trial court must initially determine that the evidence presented established the predicate fact that the funds used to pay Ms. Vedros’s separate obligations were in her possession during the community regime. . At trial, Ms. Vedros testified that .community funds were not used to pay the mortgages on 608 and 612 Gardere Avenue. She testified that her brother, Ike Soileau, and his family, lived at 608 Gard-ere Avenue and that he paid the mortgage and improvements on that property. Further, she testified that her mother, Beverly Soileau, lived at 612 Gardere Avenue and paid the mortgage on that property through her Statewide account. Thus, the thrust of Ms. Vedr.os’s: testimony.regarding this issue, was that the funds used to pay these mortgages were not in her possession during the community regime, but rather were .the funds of her brother and mother, and in their respective possessions. - To the contrary, Mr. Vedros, in his testimony, affirmed that he was seeking reimbursement-.for his . one-half of community funds that were used to pay the principal portion of the mortgages on., these two pieces of separate property. When asked what evidence he had to prove that community funds were used to pay these mortgages, he replied that he had no documents to support his claim because Ms. InVedros was in charge of the checkbook during their marriage and had all the information, such as the checks, records, and bills. In subsequent testimony, Mr. Vedros seemed to acknowledge that community funds were not used to pay the notes on these two separate properties. Mr. Vedros testified at trial as follows: Q Okay. Do you know whether or not the community paid any sort of note on those properties? A No. Q Okay. A Not from our account that I know of. Mr. Vedros’s uncertain testimony in this regard exhibits a lack of knowledge as to the source of the funds used to pay these separate obligations of Ms. Vedros. Mr. Vedros did not introduce any documentary evidence to support his belief that community funds were used to pay these separate obligations: Mr. Vedros made no attempt to controvert Ms. Vedros’s claim that her brother and mother, who lived in these houses, used their funds to pay the mortgages on these properties. Quite simply, Mr. Vedros presented no evidence that would establish that the funds used to pay these separate obligations were in the possession of Ms. Vedros during the community regime. Based upon Mr. Vedros’s equivocal testimony, and without any supporting documentation, it appears as nothing more than speculation on his part that the funds used to pay Ms. Vedros’s separate obligations were in her possession during the community regime, and thus presumed to be community funds. • Clearly, the evidence presented did not establish the predicate fact that the funds used to pay Ms. Vedros’s separate obligations on these properties were in' her possession during the community regime. Thus, Mr. Vedros was not-entitled to the benefit of the presumption contained in Article 2340, and the burden |12remained with him, without the benefit of any community presumption, to prove that the funds used to pay these separate obligations were in fact community funds. After" considering the evidence presented, the trial court denied Mr. Vedros’s claims for reimbursement on these two properties “for failure of exacting proof,” noting in its reasons for judgment that “no documentary evidence was introduced regarding any community funds used to pay on the mortgage encumbering this property.” Considering the testimony of the parties on this issue, and the lack of any documentation to support Mr. Vedros’s assertion, we find that the trial court did not err in rejecting the testimony of Mr. Vedros and accepting the testimony of Ms. Vedros on this issue. We further find that the trial court was not manifestly erroneous in denying these claims for reimbursement. Children’s Bank Accounts. On appeal, Mr. Vedros contends that the trial court erred in granting Ms. Vedros’s claim that he owed her one-half of the community portion of the funds in their two minor children’s bank accounts. Both of the Vedros children had bank accounts -established for them during the existence of the parties’ marriage. As of February 26, 2010, the date of the termination of the community, each child had $49,947.35 in his or her account. Of this sum, $20,000.00 came from an inheritance Mr. Vedros received from his mother, and the remaining funds, $29,947.35, came from deposits made by Mr. and Mrs. Ved-ros during their marriage. It is undisputed that once the community terminated, Mr. Vedros closed these accounts and-withdrew these funds. In the partition proceedings, Ms. Vedros requested that she be awarded her one-half of the community portion of the funds, which amounted to $29,947.35, in each account. At trial, Mr. Vedros testified that when he closed the children’s accounts, he put the community portion of the funds in a “neutral” bank account. He | ^maintained that he gave Ms. Vedros her share of that money. In contrast, Ms. Vedros testified that he did not. During her .testimony, she stated that in addition to closing the chilT dren’s accounts at the termination of the community, Mr. Vedros also closed other joint accounts. Ms. Vedros asserted that Mr. Vedros did not provide her with one-half of the community portion of the funds in the children’s accounts, although he did give her one-half of the funds from the other closed accounts. When specifically asked if the money she received included one-half of the money in the children’s accounts, she replied, “I don’t think the kids’ account was in there, no.” After considering the testimony, the trial court found merit to Ms. Vedros’s claim and awarded her one-half of the community portion of the funds in these two accounts., Mr. Vedros now complains that the trial court made a factual determination that is clearly not supported and is, in fact, contradicted by the record, pointing to Ms. Vedros’s testimony that she was not certain if she received the money from these accounts and his unequivocal testimony that he provided Ms. Vedros with her one-half of the community portion of these accounts. Given the conflicting testimony at trial on this issue and recognizing the great deference given to the trial court’s factual findings based on credibility determinations, we cannot say that the trial court was manifestly erroneous in awarding Ms. Vedros’s one-half of the community portion of the funds in the two children’s bank accounts. Valuation of Business On appeal, Mr. Vedros contends that the trial court erred in valuing the community portion of Total Health Services, LLC, at $69,957.00. In October of 2006, during the community property regime, Ms. Vedros, along with two other individuals, Wilhelmina Fulgenz'i and Dolores Jambón, formed Total Health Services. Ms. Vedros and Ms. Fulgenzi each acquired a |u47.2% ownership interest, and Ms.- Jambón acquired' the remaining 5.6% ownership interest in the business. The limited liability company agreement set forth' transferability restrictions as follows: “A Member • may not Transfer its Membership Interest in the Company or any portion thereof without the unanimous- written consent of -the Members.” Ms. Vedros’s 47.2% ownership interest in Total 'Health Services is a community asset; however, the -value of that interest is in dispute. During the partition trial, the judge' was presented with extensive testimohy from expert witnesses regarding the value of the community interest in Total Health Services. Mrl James Plónsey, the court appointed expert, valued' the community' portion of the business at $69,957.00, while Ms. Michele Avery, the expert presented' by Mr. Vedros, valued the community portion at $911,000.00. Both of these witnesses testified at length regarding the methods employed and the factors considered in arriving at the vastly different valuations. Mr. Plonsey testified that he used the income method, which is based on how much the company makes, to' determine its value. Specifically, he considered the Medicare' net revenue of $8,559,141.00, determined the net profit at $82,341.00, applied a capitalization factor of three based upon Louisiana sales, and determined the entire agency value to be $247,023.00. Mr. Plon-sey then considered that Ms. Vedros owned a minority interest and applied a 40% discount due to, the limited marketability of a minority interest. Thus, after the application of this discount, Mr. Plonsey valued Total Health • Services at $148,214.00 and Ms. Vedros’s ownership interest at $69,957.00. Mr. Plonsey acknowledged some of the limitations in his report. For example, in preparing his valuation, he relied on internally generated financial statements which were unaudited and which he did not verify; therefore, if the numbers he relied on were wrong, then his report likewise would be inaccurate. 1 ^Further, he did not see Ms. Vedros’s personal tax returns, was not aware that the numbers used-on the tax returns and Medicare cost reports were different, had no knowledge of the large distributions received by Ms. Vedros between 2010 and 2014, and had no knowledge or data about the personal expenses that were charged on the company credit cards. He admitted that if the owners were taking money out for personal expenditures, the profitability of the company would decrease, which would affect the value of the company. Additionally, Mr. Plonsey was questioned about Ms. Avery’s valuation of the business. He testified that he reviewed her report, noted some deficiencies in her analysis, and maintained his valuation of the company. Ms. Avery likewise testified at trial in great detail as to the methods employed in her valuation of the company. In arriving at her valuation, she employed both the income approach, which bases the value of the business on its ability to generate cash flow, and the market approach, which is based on an analysis of sales of similar businesses. Ms. Avery explained that when using the income approach, she looked at the income over the last five years, giving more weight to the 2014 financial results of the company, made normalizing adjustments based on industry standards,- and estimated the after-tax cash flow to be $385,521.00. She then applied a capitalization factor of 5.08 and arrived at a valué of $1,958,000.00. Ms. Avery also used the market approach which indicated the'value of the company to be $1,901,000.00, according to her written report. She then weighted the income and market approach equally to arrivé at a value of $1,929,500.00. After multiplying this value by- Ms. Ved-ros’s 47.2% ownership interest, she determined the fair market value of the community interest in Total Health Services as of December 31,2014, to be $911,000,00. Ms. Avery, as did Mr. Plonsey, acknowledged some of the -limitations in her report. Specifically, she did not review the detailed general ledgers- of the |1flcompany, and as a result, she calculated normalization adjustments-based pn industry standards and not on actual comparisons to other Louisiana home health agencies. Ms. Avery also acknowledged that she did not have the complete data on what other home health agencies in Louisiana used as a capitalization factor, and the use of a different capitalization factor would affect her valuation. Further, she was not aware of any restrictions on the sale and transfer of the stock and admitted that the valuation would decrease if there was a provision requiring that all three owners had to agree on any transfer of ownership. In her testimony, Ms. Avery asserted that she did' not apply a discount for lack of marketability or lack of control, although she admitted that she had applied such a discount in other cases. During her examination, she agreed that the loss of a contract would lead to a loss of potential revenue, which would make the business worth less. She had no personal knowledge of whether Total Health Services lost any contracts or had any layoffs or cuts in salaries. Additionally, Ms. Avery reviewed Mr. Plonsey’s report and explained several purported deficiencies in her testimony. Mr. Charles Brown, accepted as an expert in the field of health care brokerage, testified that he has brokered about 175 home health agencies to closing, including some in Louisiana. Mr. Brown stated that in his years as a broker, he has never sold a minority interest in a home health agency and has never had a prospective buyer inquire about a minority interest due to lack of control with a minority interest. Mr. James Beal, accepted as an expert in the field of certified public accounting with regard to health care related businesses, testified that he has been the accountant for Total Health Services since its purchase by Ms. Vedros and the other two owners. According to Mr. Beal, he is familiar with the different revenue streams and expenses that go into a home health agency. After reading Ms. Avery’s report and considering her testimony, and having been the accountant for |17Total Health Services, he believed that “some of the normalization entries she made are not necessarily correct with respect to Total’s home health field.”' He additionally testified that the appropriate capitalization factor for home health agencies in Louisiana is between 3 and 3.5%. After listening to this conflicting testimony, the trial court valued the community interest in Total Health Services at $69,957.00. In reaching this amount, the trial court considered the conflicting testimony of the experts and noted in his'reasons for judgment that “Mr. Plonsey’s testimony indicated greater familiarity with the particular type of industry for. Total Health Services, LLC,” and that “Ms. Ved-ros’ experts have industry specific qualifications surpassing Mr; Vedros’s expert’s qualifications in connection with valuing a home healthcare business.” Mr. Vedros now challenges this valuation, pointing out numerous alleged flaws in Mr. Plonsey’s report that resulted in the undervaluation of Total Health Services. Business valuation methods are not an exact science and are basically guides to determine a fair market value for buyers and sellers of a given business. In this case, the valuations have been made for the purpose of resolving community property issues. Given the dynamics of businesses and business practices, factoring in circumstances that may be unique to the parties, an inflexible formula for determining value is said to be impractical. Head v. Head, 30,585 (La. App. 2 Cir. 5/22/98), 714 So.2d 231, 234; Schiro v. Schiro, 02-542 (La. App. 5 Cir. 1/28/03), 839 So.2d 304, 308. The trial court’s determination of the value of a community business is a factual one which will not be disturbed absent manifest error. Ellington v. Ellington, 36,943 (La. App. 2 Cir. 3/18/03), 842 So.2d 1160, 1166, writ denied, 03-1092 (La. 6/27/03), 847 So.2d 1269; McDonald v. McDonald; 40,035 (La. App. 2 Cir. 8/17/05), 909 So.2d 694, 699. | ^Furthermore, the trial court’s choice of one expert’s method of valuation over that of another will not be overturned unless it is manifestly erroneous-. Ellington v. Ellington, 842 So.2d at 1166; McDonald v. McDonald, 909 So.2d at 699. In Head, supra at 234, the court noted the following in regard to the trier of fact’s evaluation of expert testimony in community- valuation cases: Generally, the trier of fact is not bound by expert testimony, but is- to hear and weigh expert testimony in the same manner as any other evidence. Reasonable and well-founded opinion should be considered. The weight to be given expert testimony is dependent upon the professional qualifications- and experience of the expert and especially on the facts on which that expert’s opinion is based. The fact-trier is entitled to assess the credibility and accept the opinion of an expert just as with other witnesses, unless the stated reasons of the expert are patently unsound. The effect and weight to be given the expert’s testimony depends upon the validity of the underlying facts relied upon by the expert, and rests within the broad discretion of the trial judge. (Internal citations omitted). In the present case, the trial court heard extensive testimony from Mr. Pl'onsey and Ms. Avery about the valuation of Total Health Services. Clearly, that. testimony was conflicting. Given the evidence in the record, we find that the trial court’s acceptance of Mr. Plonsey’s testimony regarding valuation was not manifest error. Mr. Vedros points to several reasons that would warrant this Court’s finding that the trial court was manifestly erroneous in accepting Mr. Plonsey’s valuation over that of Ms. Avery’s. In particular, Mr. Vedros asserts that the trial court erred in accepting Mr. Plonsey’s valuation because it was based on unverified data from a biased and unreliable source, failed to add personal expenses back into the cash flow, and applied discounts for lack of marketability and minority interest despite the fact that a sale was not contemplated. Mr. Ved-ros also argues that the trial court erred in stating that his expert should have removed personal goodwill from the value of Total Health Services and in further accepting Mr. Plonsey’s healthcare industry experience as a proxy for business valuation expertise, since he |13made numerous and significant errors in the application of valuation methods resulting in a materially deflated value for Total Health Services. We have reviewed each of these arguments and find no basis for a determination that the trial court was manifestly erroneous in accepting Mr. Plonsey’s valuation. With regard to Mr. Vedros’s argument about the application of discounts for minority interest, we can find no authority to suggest that such a discount can never be applied. In fact, the case relied upon by Mr. Vedros, Cannon v. Bertrand, 08-1073 (La. 1/21/09), 2 So.3d 393, to support his argument, does not state that marketability discounts should never be used. Rather, the Louisiana Supreme Court stated, “Minority discounts and other discounts, such as for lack of marketability, may have a place in our law; however, such discounts must be used sparingly and only when the facts support their use.” Id. at 396. Under the particular facts in Cannon, the court found that the use of such a discount was unwarranted. Particularly, the buyers. of the partnership interest at issue were the two remaining partners in the partnership and thus would not be subject to a lack of control as would a third party. Additionally, lack of marketability was not applicable in Cannon because the partners had already decided .to purchase the partnership shares themselves by opting to continue the partnership and avoid liquidation. However, in Trahan v. Trahan, 10-109 (La. App. 1 Cir. 6/11/10), 43 So.3d 218, writ denied, 10-2014 (La. 11/12/10), 49 So.3d 889, the First Circuit did apply a lack of marketability discount. After distinguishing the Cannon case, the Trahan court determined that the marketability discount was properly applied in determining fair market value of the husband’s company in proceedings to partition community property, where the company at issue was a small, closely held company, and although the husband was the majority owner, he and his business partner worked closely together to make decisions for the company. |aoAs did the First Circuit in Trahan, we likewise find the facts in the instant case to be distinguishable from the circumstances in Cannon. In particular, the two other members are not trying to buy out Ms. Vedros’s interest, and therefore, any third party purchaser would be subject to a lack of control. Mr. Vedros'further points out that the trial court erred in stating that his expert should have removed personal goodwill from the value of Total Health Services. Removal of personal goodwill from the valuation is supported by La. R.S. 9:2801.2, which provides as follows: ■ In a proceeding to partition the community, the court may include, in the valuation of any community-owned corporate, commercial, or professional business, the goodwill of the business. However, that portion of the goodwill attributable to any personal quality of the spouse awarded the business shall not be included in the valuation of a business. Accordingly, the arguments presented by Mr. Vedros regarding the valuation of the business are without -merit. Based on our review of the evidence in the record, we find no manifest error in the trial court’s acceptance of Mr. Plonsey’s valuation of the community interest in Total Health Services. Distributions from Total Health Services, LLC Mr. Vedros contends that the trial court erred in denying his claim for reimbursement for the K-l distributions made by Total Health Services from the years 2010 to 2014. There is no dispute that Total Health Services was acquired during the parties’ marriage and that the portion owned by the Vedroses is a community asset. Total Health Services is classified as an S corporation. S corporations are defined by the IRS as corporations that elect to pass corporate-’ income, losses, deductions, and credits through to their shareholders for federal tax purposes. Shareholders of S corporations report the flow-through of income and losses on their personal tax returns and are assessed taxes at their individual income tax rates. At trial, both linMr. Beal and Ms. Avery explained the tax advantages of such a corporation. Mr. Beal explained that in an S corporation, all of the profit or loss gets reported on the owner’s personal tax return, “whether it’s in the form of a salary or whether it’s in the form of the profit or loss from the company.” The specific wages’ are subject to payroll taxes, whereas the distributions of profits to the owners are not. Mr. Beal explained that because the IRS only requires that the S corporation owners take a reasonable compensation, “a lot of companies go to varying extremes in how much they pay in salary, how much they take in distributions.” Ms. Avery also explained that an S corporation has very specific tax consequences dependent on whether the income received by the owners is classified as W-2 compensation or K-l distributions. She explained that the portion that is treated as income on the W-2 forms is subject to payroll taxes, whereas the non-W-2 income, reflected- on a K-l form, is not subject to those taxes. She also testified that because ’ S corporation shareholders, in order to avoid incurring payroll taxes, tend to minimize their compensation for work performed and instead report it as K-l income for their ownership interests, IRS regulations mandate that S corporation shareholders pay themselves a reasonable wage or compensation.[4] In accordance with these basic guidelines, Ms. Vedros filed her personal tax returns, which indicated her “reasonable compensation.” The corporation’s K-l forms indicated other .monies she received through Total Health Services. The K-l forms that were introduced at trial reflected that Ms. Vedros received $281,029.00 in 2010, $598,016.00 in 2011, $293,957.00 in 2012, $137,9Í8.00 in 2013, and $25,016.00 in 2014, for a total of $1,335,936.00. Mr. Vedros did not receive ally portion of these disbursements. Despite the fact that they accrued after the termination of the community, Mr. Vedros claims that he is entitled to | ^$667,968.00, his one-half portion of distributions made by Total Health Services from 2010 to 2014. • During the partition trial, the court heard testimony about the owners’ compensation packages, the roles of the three owners, and the advantages of. and requirements for an S corporation. After listening to the evidence presented, the trial court denied Mr. Vedros’s claim, finding that he was not entitled to reimbursement for these distributions; In its reasons for judgment, the trial court explained as follows: Ms. Vedros and Total Health Services, LLC CPA, James Beal, testified that the owners received W-2 pay and bonuses to form their complete compensation package. They both testified that no passive distributions were paid in the traditional sense because all funds paid were for services performed. Ms. Vedros. introduces K-36 as an example of how her W-2 bonus compensation, was split in ,2013 and 2014. The Louisiana Civil Code does not necessarily treat all corporate distributions as “fruits” to be treated as community property. Article 551 of the Civil Code defines the term “fruits”’ as things produced by or derived from another thing without. diminution .of its substance. La, C.C. art. 551. Article 551 provides, in part, “Civil fruits are revenues derived from a thing .by operation .of law or by reasons of a juridical act, such as rentals, interest, and certain corporate distributions,” The word. “certain” indicates that not all corporate distributions are fruits of the corporation’s stock. Article 651 and the comments thereto do not specify what types of corporate distributions constitute fruits and what type, of distributions do not constitute fruits. The Court agrees that these “distributions” are part of Ms. Vedros’ compensation packages derived from Ms. Vedros’ effort, skill, and industry post termination. The Court finds that the “distributions”, are classified as Ms. Vedros’ separate, property, not fruits. Mr. Vedros’ claim for reimbursement is denied. Mr. Vedros now challenges this denial. According to La. C.C. art. 2338, community property includes property acquired during- the’ existence of the legal regime through the effort, skill, or industry of either spouse, property acquired with com--munity things, and the natural and civil fruits of community property. After termination of the community property regime, the provisions governing co-ownership apply to former community property, unless .otherwise provided by law or by juridical act, La. C.C. art. 2369.1. Each spouse owns an undivided, one-half | ¡^interest in the former community property and its fruits and products. La. C.C. art. 2369.2. The term “civil fruits” is defined in La. C.C. 551 as “revenues derived from a thing by operation of law or by reason of juridical act, such as rentals, interest, and certain corporate distributions.” This Court is now faced with the issue of whether the trial court was manifestly erroneous in its determination that the distributions received by Ms, Vedros after the termination of the community regime were the product of her effort, skill, or industry, rather than “civil fruits” of the former community ownership interest in Total Health Services. Mr. Vedros asserts that he is entitled to one-half of the distributions because they were made based on each party’s ownership interest and not based on the effort, skill, or industry of Ms. Vedros. To the contrary, Ms. Vedros contends that these distributions were part of her compensation package based upon-her many roles at Total Health Services, and therefore, Mr. Vedros has no reimbursement claim, because the distributions were part of her wages and derived from her effort, skill, and industry post-termination. To support her argument that Mr. Ved-ros has no claim to the distributions that were paid subsequent to the termination of the community, Ms. Vedros cites Boone v. Boone, 39,544 (La. App. 2 Cir. 4/6/05); 899 So.2d 823, in which 'the Second Circuit addressed the propriety of the trial court’s classification of distributions as earnings. In that case, Peggy Boone filed a suit to partition shareholder distributions received by her former husband, David Boone, subsequent to the termination of the community from Boone Oilfield Consulting, a community-owned Subchapter S corporation. After considering the testimony presented; the trial court found that the distributions received after the termination of the community were actually- earnings and not subject to the partition claim. Ms. Boone thereafter appealed and challenged the trial court’s classification of the distributions as earnings. The Second Circuit affirmed the trial court’s I ¡^classification of the ■ distributions as earnings, noting that Ms. Boone failed to meet her burden of proving that the shareholder distributions constituted community assets, rather -than earnings resulting primarily from skill, industry, and labor of Mr. Boone. In affirming the trial court’s classification, the Second Circuit considered the following: David testified that the corporation had no capital assets, and its only product was his own advice to clients. The corporation’s former CPA, Mr. Carpenter, testifying on Peggy’s behalf, corroborated that it was a consulting business with no significant assets or capital investment; its income was generated solely- by David’s expertise in the field. Peggy’s CPA and brother, Lonnie Hardy, did not seriously dispute Mr. Carpenter’s assessment. Peggy’s most emphatic witness, Mr; Youngblood, admitted making many assumptions about the case but never indicated he had any knowledge of how the corporation made its money. All witnesses agreed that just because payments were labeled “corporate distributions” did not determine their true nature. On this evidence, the district court was entitled to find that the “corporate distributions” were income resulting exclusively from David’s effort, skill or industry, and not civil fruits derived by juridical act. Id. at 828. We note that this case is distinguishable from the one presently before this Court. Particularly, Mr, Boone was the sole shareholder, the corporation had no significant assets or capital investment, and the income was generated solely by Mr. Boone’s expertise in the field. Given these distinctions, we do not find the Boone case dispositive of this issue as suggested by Ms. Vedros. Rather, we find the instant case more analogous to Bulloch v. Bulloch, 51,146 (La. App. 2 Cir. 1/18/17), 214 So.3d 930, writ denied, 17-348 (La. 4/13/17), 218 So.3d 629. At issue in that case were distributions received by Dr. Bulloch from his interest in the Advanced Surgery Center (ASC), a limited liability corporation, subsequent to the filing of the petition for divorce. Dr. Bulloch, a physician who performed surgeries at ASC, purchased five units in the surgery center when it opened, representing a 5.1% ownership interest in the company. The number of units that each member physician was allowed to | ^purchase was established from his or her historical volume of surgeries calculated over a period of time. Dr.. Bulloch apparently received monthly distributions from ASC for- his membership interest that were not based per se on the number of surgeries he performed, although the operating agreement required that he perform a certain percentage of hjs surgeries at ASC to avoid disassociation from ASC. Subsequent to the filing of the divorce petition, Dr. Bulloch received $543,755.00 in disbursements or distributions from ASC. Ms. Bulloch claimed that she was entitled to receive one-half of the disbursements since they were civil fruits of the former community ownership interest in the corporation. The trial court disagreed with Ms. Bulloch’s assessment and determined that the disbursements made to Dr. Bulloch constituted compensation for his work done after Ms. Bulloch filed for divorce, and therefore, they were properly excluded from consideration as part of the patrimony to be partitioned. The Second Circuit disagreed with the trial court’s conclusion. In finding that Ms. Bulloch was entitled to receive one-half of the $543,755.00 in distributions made to Dr. Bulloch during the post-termination period until the partition judgment, the appellate court noted several factors. The court considered that Dr. Bulloch was compensated for the surgical procedures he performed at ASC and that he presumably received the same compensation for his skill and industry for the surgical procedures he performed at other surgery centers where he had no ownership interest. Further, the non-physician member of the corporation also received distributions, and hypothetically, Dr. Bulloch would still receive distributions as long as he was a partner of ASC, regardless of whether he performed surgeries, although the operating agreement provided that a participating partner perform a certain number of his procedures at ASC- Lastly, the Second Circuit considered the testimony at trial that if the distributions were based solely on the effort, skill, or industry of each physician, Dr. Bulloch would 12fihave received 6.7% of the gross receipts for the period because that was the percentage directly attributable to his referrals, rather than the 5.1% he was entitled to receive in accordance with his ownership interest. Being mindful of the standard of review for factual determinations of the trial court, and having thoroughly reviewed the record in light of the applicable law and jurisprudence, we find that the trial court was manifestly erroneous in concluding that the contested distributions received by Ms. Vedros constituted “part of Ms. Vedros’ compensation packages derived from Ms. Vedros’ effort, skill, and industry post termination.” At trial, both Mr. Beal’s and Ms. Vedros’s testimony indicated that the disbursements received by the owners were “bonuses”, and part of theft overall compensation package, that no passive distributions were received, and that disbursements were for services performed. As this testimony is internally inconsistent ■with other testimony presented at trial as well as the documentary evidence introduced, we are warranted in our finding of manifest error. Despite Ms. Vedros’s repeated insistence that the distributions made to her after termination of the community regime were “bonuses,” and thus part of her compensation package due to her effort, skill or industry, - these distributions were reported to ■ the IRS on K-l forms. Ms. Avery clearly testified- that bonuses are properly reported on a W-2 form, not a K-1 form. While Mr. Beal emphasized the vast discretion that .owners of S corporations- have in the allocation of disbursements to an owner/employee between earned wages/bonuses and ownership distributions, he did not dispute that bonuses are not properly reported to the IRS on a K-l form. In fact, Mr. Beal also testified that bonuses go onto a W-2 form and suggested that the corporation may need to amend its tax returns. No evidence was-introduced to indicate that the corporation has made any efforts- to amend its tax returns since 2010. ^Additionally, the úncontradicted testimony of both Ms. Avéry and Mr. Beal was that reporting these distributions to the IRS on a K-l form afforded both Ms. Vedros and the corporation certain tax benefits. Given that no effort has been made by Ms. Vedros, during the many years of this pending partition proceeding, to have the corporation amend its tax returns, we find it highly unlikely that the owners informed Mr. Beal that these distributions were “bonuses,” and he nonetheless, knowing it to be improper, reported them on K-l forms, thus obtaining unwarranted tax benefits for the corporation and its owners. Furthermore, while we acknowledge that the manner of reporting distributions to the IRS for tax purposes is not controlling of the court’s determination of the characterization of the distributions as community or separate for partition purposes, we find that it is a relevant factor for the court to consider in making its determination. To ignore this factor would require the court to turn a blind eye to the fact that Ms. Vedros has represented the characterization of the distributions in one way to the IRS, and acquired a benefit for the corporation in doing so, and, in essence, now represents the characterization of the distributions in the opposite way to the court, in the hopes of receiving a substantial personal benefit. We agree with the trial court’s use of the terms “incredible” and “unreliable” in its assessment of some of Ms. Vedros’s testimony. Both Ms. Avery and Mr. Beal testified that distributions of profits made by an S corporation are supposed to be based on pro-rata ownership interest. In regard to his testimony on this point, Mr. Beal indicated that the IRS can terminate an S corporation’s status as án S corporation if ownership distributions are not made according to pro-rata ownership interest. Ms. Avery testified, “The S Corp rules, tax rules require that all of the distributions be done equally ... pro rata, based upon their pro rata based upon their ownership interests.” In addition^ Ms. Hooter, the former bookkeeper for Total Health Services, testified that she was | ^involved in issuing checks for distributions and/or bonuses. She testified that there was a difference between the checks they received for distributions, for which they did not incur payroll taxes, and the; checks they received for bonuses. Ms. Hooter plainly explained, “Distributions had to be based on a percentage of ownership.” Additionally, the “Amended and Restated Limited Liability Company Agreement of Total Health Services, LLC” specifically provides that to the. extent that the members determine that “excess” cash on hand (ie., corporate profits) exists such that a distribution is warranted, “such clistribution(s) shall be made to the members in proportion to their Membership Interest Percentages.” The K-l forms introduced into evidence reflect that the amount of monies received by the -owners in disbursements were, in direct proportion to the ownership interests of each member. The forms specifically show that Ms. Vedros and Ms. Fulgenzi, who both owned 47.2% of the corporation, received the same amounts in .distributions, while Ms. Jambón, who owned 5.6% percent of the corporation, received a considerably lesser amount, in proportion to her ownership interest, The key factor in our determination that the trial court was manifestly erroneous in its finding that the disbursements to Ms. Vedros, as shown on the K.-1 forms, were due to her effort, skill, or industry, is the disbursement of corporate funds to Ms. Fulgenzi. Ms. Vedros, as well as other witnesses, confirmed Ms. Vedros’s dominant role in the company. Ms. Vedros is the managing member and handles the daily operations.. Among other duties, Ms. Vedros is involved in auditing charts, coding, and marketing. In addition, she sees patients, performs community outreach, visits doctors, and attends meetings and seminars. In 'contrast, Ms. Fulgenzi described herself as a silent partner, having only been brought into the corporation for financial backing. She testified that her time was consumed with operating a separate business that she owns, that she did not have any involvement in the day-| ^to-day operations of Total Health Services and did not regularly go into the office, and that her involvement was limited to participating in decisions regarding distributions and bonuses. Based upon this uncontroverted testimony, unless Ms. Vedros was admitting to gross mismanagement of the corporation by paying substantial sums of money to someone who admittedly did no work for the company, Ms.'Fulgenzi’s disbursements were clearly due to her ownership interest. We do not believe it to be mere coincidence that, in accordance with IRS regulations and the company’s own operating agreement, Ms. Vedros, who has the. same ownership interest as Ms. Fulgenzi, received the exact same sums in distributions as Ms. Fulgenzi. Nor do we believe it to be mere coincidence that the. company reported these distributions to the IRS; on K-l forms, representing, distributions for ownership interests, rather than on a W-2, representing wages or bonuses. Lastly, we do not believe that if these disbursements were due to the effort, skill, or industry of the owners, Ms. Fulgenzi, who admittedly did no work for the corporation, would have received the same amount as Ms. Vedros, and that she would have received substantially more than Ms. Jambón, who-was the director of nursing and participated in the day-to-day operations Of the company. Given these factors, we find-that the trial court committed manifest error in classifying the. distributions as part of Ms. Vedros’s compensation package derived from her effort, skill, and industry and in denying Mr. Vedros’s claim for $667,968.00, his. one-half portion of the distributions made by Total Health Services from 2010 to 2014. Accordingly, we reverse that portion of the trial court judgment that denied Mr, Vedros’s reimbursement claim for his share of these distributions., Qualified Domestic Relations Order In his final assigned error, Mr. Vedros contends the trial court erred when it ordered him to make an equalizing payment in the amount of $151,,750.09. | .^Specifically, he asserts that the trial court should have awarded the sum due to Ms, Vedros by way of a Qualified Domestic Relations Order since the majority of the funds the trial court found due to her was derived from the retirement/pension..accounts of Mr. Vedros. Due to our reversal of two rulings of the trial court on two of Mr. Vedros’s reimbursement claims, our recalculation of the sums owed by each party to the other results in Ms. Vedros owing Mr. Vedros an equalizing payment in the amount of $529,121.27. Accordingly, Mr, -Vedros’s assignment of error regard-mg the manner in which the trial court ordered him to make an equalizing payment is now moot. CONCLUSION For the foregoing reasons,' we reverse that portion of the trial court judgment that denied Mr. Vedros’s reimbursement claim for his one-half share of community funds used to pay the mortgage notes on the Fort Leon property, and we award Mr. Vedros his one-half share of these community funds. We also reverse that portion of the trial court .judgment that denied Mr. Vedros’s reimbursement claim for, his share of distributions made to Ms. Vedros from Total Health Services from 2010 to 2014, and we award Mr. Vedros his one-half share of these distributions. Lastly, having reversed the trial court on the two foregoing reimbursement claims, and recalculated the equalizing payment between the parties, we amend the judgment of the trial court to delete the order that required Mr. Vedros to make an equalizing payment to Ms., Vedros, and further amend the judgment to, order Ms. Vedros to pay to Mr. Vedros an equalizing payment in the amount of $529,121.27. In all other respects, we affirm the judgment of the trial court. ■ REVERSED IN PÁRT; AFFIRMED IN PART; AND AMENDED IN PART . We note that since this was presumably a joint checking account, both Mr. and Ms. Vedros would have had access to the can-celled checks. . 1 In his appellate brief, Mr. Vedros asserts, “Ms. Ve.dros testified, under oath, as to the payment by the community of $25,799.71 towards her separate obligation.”' Our review of her testimony reflects the correct calculation to be $25,806.71. . . In that portion of his reasons for judgment dealing with this issue, the trial court stated the following: "Mr. Vedros contends that $32,200.00 of community funds were used to pay the mortgage on this property. The law presumes that these payments were made from community and Ms. Vedros failed' to prove otherwise. As such, Mr. Vedros avers that he is entitled to a reimbursement of $16,100.00 for payments made on this property." Taken out of context, the phrase "[t]he law presumes 'that these payments were made from community” appears to be a statement of the law by the trial judge. However, if such phrase were intended as an affirmative states ment of the law by the trial judge, logic would dictate that the immediately following phrase in the same sentence, i.e,, "Ms. Vedros failed to prove otherwise,” joined by the conjunctive "and,” would also be an affirmative statement of a finding of fact by the trial judge. Clearly, if the trial judge had found that there was a presumption bf community, and that Ms. Ved-ros failed to rebut that presumption, then he would not have shifted the burden back to Mr. Vedros to prove the community nature of the funds used, and his ruling would have necessarily been in favor of Mr. Vedros on this issue. In our opinion, the sentence referring to a presumption of community, juxtaposed between two sentences that are clearly recitations of Mr. Vedros’s arguments, is also a recitation by the trial judge of Mr. Vedros’s argument, and not a statement of the applicable law or a finding of fact by the trial judge. Regardless, even if this phrase indicates that the trial judge believed that there was a presumption that the payments were made from the community, and gave Mr. Vedros the benefit of that presumption, because he ultimately placed the burden of proof on Mr. Vedros on this issue, and we find, as discussed infra, that he was not manifestly érroneous in finding that Mr. Vedros failed to carry his burden of proof, the fact that he may have erroneously given Mr. Vedros the benefit of a nonexistent presumption does not affect our resolution of this issue. . This regulation is only applicable to individuals who, in addition to being shareholders, also perform work for the company and are entitled to be compensated for that work.